United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 24, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 05-60046

———————————

URBAN DEVELOPERS LLC,

                                    Plaintiff-Appellee,

        versus

CITY OF JACKSON MISSISSIPPI; ET AL,

                                    Defendants,

CITY OF JACKSON MISSISSIPPI;
MISSISSIPPI REGIONAL HOUSING
AUTHORITY VI; JOHN MURPHY, in his
official and individual capacities;
SHARON WILSON, in her official and
individual capacities,

                                    Defendants-Appellants.

———————————

Appeals from the United States District Court
for the Southern District of Mississippi

———————————

Before GARWOOD, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

GARWOOD, Circuit Judge:

    Plaintiff-appellant Urban Developers LLC brought this suit

against the City of Jackson and its Mayor, Harvey Johnson, in his

individual and official capacities; and also against the

Mississippi Regional Housing Authority VI (MRHA) and its officers,

John Murphy and Sharon Wilson, in their individual and official

capacities. Urban Developers asserted federal takings and procedural due process claims under section 1983, and supplemental state-law claims for taking and deprivation without due process under the Mississippi Constitution, breach of contract, tortious interference with contract, and negligence. A jury found for Urban Developers on most claims except those against Mayor Johnson (and those against the City for negligence and tortious interference). The district court entered judgment on the verdict in favor of Urban Developers and against the City, the MRHA, Murphy and Wilson. In accordance with the jury verdict, the judgment awarded Urban Developers $1,000,000 damages as against the MRHA, Wilson and Murphy, jointly and severally, and also $415,000 damages as against the City. The judgment likewise awarded Urban Developers attorney's fees in the amount of $48,363 as against the City and also $118,406 as against the MRHA, Wilson and Murphy, jointly and severally.

The City of Jackson appeals contending, *inter alia*, that none of Urban Developers' winning claims were ripe for review. We agree, and dismiss without prejudice all claims appealed by the City.

The MRHA, Murphy and Wilson challenge subject matter jurisdiction and appeal from the district court's denial of their motion for judgment as a matter of law, principally contending that the jury erred in finding that a contract existed between the MRHA

2

and Urban Developers.  We agree, and reverse the district court's rulings on the following matters:  the contract question, the related state and federal procedural due process claims arising out of an alleged deprivation of those same contract rights, the Mississippi takings claim against the MRHA and Murphy, and the court's ruling on the claims arising under the Mississippi Tort Claims Act.  We dismiss all remaining claims against the MRHA and its officers without prejudice as unripe.

## FACTS AND PROCEEDINGS BELOW

In 1978, the Department of Housing and Urban Development (HUD) faced a nationwide shortage of low-income housing because an estimated 2.7 million apartment units suffered from deficiencies that made them ineligible for HUD rental subsidies.  To address this problem, Congress amended Section 8 of the United States Housing Act of 1937, to create the Moderate Rehabilitation ("Mod Rehab") program.  42 U.S.C. § 1437f (1982).  This program authorized HUD to provide financial incentives to the owners of substandard housing to upgrade their properties. Act of Oct. 31, 1978, Pub.L. No. 95-557, § 206(e), 92 Stat. 2080, 2092.

HUD regulations governing the program made state public-housing authorities responsible for the program's administration.  These public housing authorities would first decide which substandard properties qualified for funding, 24 C.F.R. §§ 882.503-882.504 (1982), and would then contract with the

3

owners to rehabilitate the properties. 24 C.F.R. § 882.505 (1982). Once the property was adequately upgraded, 24 C.F.R. § 882.506 (1982), the owners were eligible for contracts with the public housing authority, funded though HUD, that guaranteed a fifteen-year stream of rental subsidies. These rents were pegged at up to 120% of the fair market value, an income stream intended to cover both the costs of rehabilitation as well as operating expenses. 24 C.F.R. §§ 882.403(c), 882.409 (1982). HUD oversaw the public housing authorities' administration of the Mod Rehab program, allocating funds to qualified public housing authorities under one-year annual contribution contracts. 24 C.F.R. §§ 882.403, 882.501 (1982).

In 1990, Congress repealed the Mod Rehab program, but has since provided for one-year extensions on expiring contracts at the owner's request. 42 U.S.C. 1437f (e)(2), *repealed by* Cranston-Gonzalez National Affordable Housing Act of 1990, Title II, § 289(b), 104 Stat. 4128. *See, e.g.*, HUD Directive Number 01-29, Financial Management Program Requirements for Section 8 Moderate Rehabilitation Program Housing (2001) (providing for extensions).

The Mississippi legislature created local and regional housing authorities in 1938 to provide "safe and sanitary dwelling accommodations for persons of low income." Miss. Code Ann. § 43-33-3 (2001). The defendant-appellant, MRHA, is one such

4

regional housing authority. It is responsible for the administration of the Section 8 housing programs for nine counties in Northeast Mississippi, and is governed by a nine-member board of commissioners which meets monthly. MRHA is authorized to develop and operate low-income housing under the United States Housing Act of 1937. 42 U.S.C. § 1437a(b)(6). During much of the time period relevant to this litigation, Sharon Wilson was the assistant executive director of the MRHA, and her supervisor, John Murphy, was the interim executive director. Both Wilson and Murphy are sued in their individual and official capacities.

The plaintiff-appellee, Urban Developers LLC, a Mississippi limited liability company, was at all times run by its principal member, Shahid Shaikh. On November 20, 2000, Urban Developers purchased the often-flooded and nearly-bankrupt Town Creek Apartments in Jackson, Mississippi, a city within MRHA's region. Town Creek's revenue came entirely from MRHA tenants, subsidized by two Mod Rehab contracts that the prior owner, Mitchell Company, had executed with the MRHA in 1984. Lured by these Mod Rehab contracts, Urban Developers purchased Town Creek from the Mitchell Company and its lienholding banks. Urban Developers was unaware of the flood danger and did not seek flood insurance.

The question of whether the two Mod Rehab contracts were properly assigned from the Mitchell Company to Urban Developers was a highly contested issue at trial. Although both contracts

5

required the express, written consent of the MRHA as a precondition of assignment,[1] such written consent was never given to either the Mitchell Company or Urban Developers, and the MRHA's board minutes contain no discussion or vote approving (or in any way addressing) any assignment of the contracts. The Mitchell Company did however receive oral approval for the assignment from several representatives of MRHA, including the defendant Wilson. At the time, it seems, no one cared about the improper assignment. Urban Developers had rescued the Town Creek Apartments from likely insolvency or lien foreclosure and had immediately invested $200,000 for repairs to the apartments. The MRHA increased Urban Developers' monthly payments as Shaikh brought more apartments up to standard, and suggested that they would continue to renew Urban Developers' yearly Mod Rehab contracts as long as Congress continued to fund them. In fact, since 1998, the yearly directives issued by HUD had required housing authorities to renew the expiring yearly contracts if the owner so requested.

The two contracts associated with Town Creek Apartments were due to expire on March 31, 2001, and October 31, 2001.[2] Because

---

[1] Section 1.18 of the Mod Rehab contracts provides: "The Owner has not made, and agrees not to make, any transfer in any form of this Contract or the property without the prior written consent of the PHA."

[2] The first contract (covering a portion of the Town Creek Apartments) was effective April 3, 1984 and expired by its terms March 31, 1999; prior to March 31, 1999 it was renewed for a one year term expiring March 31, 2000; prior to March 31, 2000 it was

6

the appropriations bill was delayed in Congress that year, the HUD directives that explained renewal procedures for FY 2002, beginning October 1, 2001, were also delayed until the Spring of 2001.[3] So, it wasn't until July 5, 2001, that Sharon Wilson sent a letter to Shaikh, requesting written verification of his interest in renewing the contracts, outlining the renewal process, and proposing a reduction in rent for the following year. Shaikh replied in writing five days later, notifying her that he did desire to renew both contracts and disputing the lowered rent. In the letter, Shaikh advised Wilson that, in accordance with HUD regulations, he would renew at the lower rate but would then avail himself of an appeal to HUD. Wilson, however, in contravention of HUD regulations, refused to let Shaikh renew the contracts until the dispute about rental values was settled.

During that same period, the MRHA was deciding whether it should just let the two contracts expire. When the time came to request funding from HUD for the 2002 fiscal year, the MRHA's

---

again renewed for another one year term expiring March 31, 2001. The second contract (covering the remainder of the Town Creek Apartments) was effective November 1, 1984 and expired by its terms October 31, 1999; prior to November 1, 1999 it was renewed for a one year term expiring October 31, 2000; prior to November 1, 2000, it was again renewed for a one year term expiring October 31, 2001.

[3] Directive Number 2001-13, Financial Management Program Requirements for Section 8 Moderate Rehabilitation Program Housing (2001).

executive director who preceded Murphy[4] (and who is not party to this suit) did not include Town Creek's Mod Rehab contracts in the budget, deciding instead to rely on tenant-based assistance in the form of housing-choice vouchers. On July 15, 2001, the MRHA board approved a budget for 2002 that did not include funds for the two Mod Rehab contracts. Shiakh was not notified of this decision until months later.

By August 2001, Shaikh and Wilson were deep into the rental dispute. The first contract had already expired on March 31, 2001, although apparently it was common practice for the MRHA to continue to pay rental subsidies so long as extension negotiations were on-going. The second contract was due to expire on October 31, 2001.

In the early morning of August 12, 2001, a flash flood inundated twenty-two ground-level units of the Town Creek apartments, filling some with as much as four to five feet of water.[5] That day, the governor of Mississippi declared a state of emergency in the City of Jackson and nearby counties. On August 15, 2001, Mayor Johnson visited the apartments and then allegedly told Murphy that the City was going to condemn the entire Town

---

[4] Murphy assumed the title of interim executive director of the MRHA on July 18, 2001. His predecessor was Bobby Hensely.

[5] There were 70 occupied units at Town Creek when the flood occurred. Seven of its twelve apartment buildings were badly damaged.

Creek Apartment complex, that no tenants would be allowed to continue living on the property, and that the Housing Authority should issue housing-choice vouchers to all of the tenants.

On August 17, 2001, Murphy was out of town at a HUD conference. Over the phone, Shaikh suggested to Murphy that, instead of issuing housing-choice vouchers to the tenants, which would give them an option to seek shelter elsewhere, the MRHA should shelter the displaced tenants in vacant units at Town Creek that were unaffected by the flood. Murphy hesitated, responding that "he wasn't sure if he could do that and that he needed some direction from the City if he would be allowed to do that." That same day, after discussion with some HUD officials at the conference, and under the mistaken belief that the entire apartment complex was being condemned, Murphy called Wilson and directed her to issue housing-choice vouchers to all the residents of Town Creek. At trial, Wilson testified that while she and her staff were handing out these vouchers, they told the residents that, because Town Creek was under a different section 8 program, they couldn't use the vouchers at Town Creek.

This action was taken, Urban Developers argues, despite the fact that MRHA had not conducted formal housing-quality inspections of the units, as required by HUD regulations. Murphy's swift action was in contravention of other HUD regulations as well, including directives that encouraged housing authorities to

9

temporarily relocate displaced tenants in their same complex while repairs were made, and regulations that required the housing authority to give Urban Developers notice of any deficiencies and at least twenty-four hours to repair the units.

When Shaikh found out that MRHA was issuing vouchers to everyone at Town Creek, he immediately called Murphy. Murphy said that "the property was condemned and, given that situation, that the tenants needed to be handed out vouchers and relocated." Shaikh told Murphy that he hadn't received any condemnation notice from the City. When they hung up, Shaikh then called a city official who confirmed that there had not yet been a condemnation decision: the City was still reviewing what needed to be done. In fact, at an August 29, 2001 hearing with city officials, Shaikh outlined his plans for repair, and no one mentioned condemnation.

On August 31, Shaikh met with Murphy at the MRHA office and asked Murphy where he got the idea that Town Creek was condemned. Murphy played him an August 16 answering-machine message from the Mayor's office, instructing MRHA to issue vouchers ahead of the impending condemnation. Murphy admitted to Shaikh that he hadn't followed proper procedure and promised to renew the Mod Rehab contracts if Shaikh didn't make a stink about it. At trial, Murphy again admitted that he "may have made a technical error [in handing out vouchers], but . . . [t]he technicality relates to whether proper notice was given." In the month of September 2001, all but

10

eight units of Town Creek Apartments were vacant.

On October 10, a City official sent Urban Developers notice of condemnation for forty of Town Creek's ninety-five apartment units. The City official also informed Urban Developers that because the City's Floodplain Management Ordinance applied, Urban Developers could not make any repairs to the Town Creek apartments without first elevating the buildings. The Ordinance applies to flood-zone structures where the cost of restoring the structure to its prior condition would equal or exceed fifty percent of its prior market value. Shaikh protested, arguing that his cost of repairs was well below fifty percent of market value. On October 15, the City official requested a repair plan from Shaikh, which he provided.

On October 17, 2001, Wilson sent a letter to Shaikh, explaining that "[i]n view of the [Town Creek] tenants being issued a Housing Choice voucher due to the August flooding the Housing Assistance Payments will terminate as the families locate new units for rent." By the end of October, fewer than five tenants remained at Town Creek. Through a November 1, 2001 letter from the MRHA to Town Creek, the MRHA advised, with respect to a particular tenant resident at the apartments under a signed lease, that "We will continue the HAP [payments] as long as he continues his residency or until the HAP contract expires."

In a November 30 letter, a City official requested further details concerning Urban Developers' repair plan. Around the same time, Murphy told Shaikh that he could not renew the Mod Rehab

contract because HUD had not budgeted money for the Mod Rehab contract associated with Town Creek. In response, Shaikh wrote a letter to Murphy, insisting upon MRHA's obligation, under its Annual Contribution Contract with HUD, to renew the contracts at the owner's request. In a letter dated December 27, 2001, Murphy responded to Shaikh, advising him that (1) the Mod Rehab contracts had expired because Urban Developers had not agreed to the reduced rent;(2) the contracts were never valid because MRHA hadn't given the Mitchell Company written authorization to assign to Urban Developers; and (3) HUD was responsible for the contract's termination because HUD had failed to fund it. Shaikh thereafter contacted HUD directly. On December 31, 2001, a regional HUD official told Shaikh that the MRHA had failed to request funding for the Town Creek contracts back in July.

Urban Developers never followed through with its repair plans and never requested a building permit, because, as Shaikh suggested at trial, the apartments weren't worth repairing without the Mod Rehab contracts.

Urban Developers asserts that Wilson violated HUD regulations that require all public housing authorities to (1) renew all Mod Rehab contracts if the owner so requests; (2) in case of a dispute about the rent, renew the contract and let the owner appeal the rent reduction; and (3) provide owners with one year's notice before terminating a contract. Wilson in her testimony agreed "in hindsight" with the statement, apparently in respect to not

12

furnishing housing assistance payments for tenants to relocate from flood damaged units at Town Creek to undamaged units but instead furnishing those tenants housing choice vouchers, that "MRHA VI chose to act under political pressure and without following guidelines and with insufficient and/or factually incorrect grounds for the decisions it made." She likewise testified "I think it [the Mod Rehab contract] should have been renewed. The owner had complied with the housing quality standards, had done repairs, [and] had a good working relationship with the Authority."

## DISCUSSION

### I. Claims Against the City of Jackson

Against the City of Jackson alone, Urban Developers alleged (1) a claim under the United States Constitution, through 42 U.S.C. § 1983, for deprivation of property without procedural due process; (2) a claim under the United States Constitution, through section 1983, for taking of property without just compensation; (3) a claim under the Mississippi Constitution for deprivation of property without procedural due process; and (4) a claim under the Mississippi Constitution for taking of property without just compensation. Against both the City of Jackson and Mayor Johnson, Urban Developers alleged, (5) a claim for tortious interference with business relationships; and (6) a claim for negligence.

At the charge conference, Urban Developers withdrew its claims of tortious interference with business relations (and its claims of breach of the duties or warranties of good faith and fair dealing).

13

The remaining claims were tried to the jury. At the close of evidence, the jury rejected the claim that the City and Mayor Johnson negligently informed MRHA or its staff that the City had condemned the apartments, but found in favor of Urban Developers on all four (federal and state) constitutional claims against the City, awarding damages of $415,000.

Because none of Urban Developers' winning claims were ripe, we dismiss them without prejudice for lack of subject matter jurisdiction as being unripe.[6]

A. What Property was Taken

The jury instructions identify the property interests that were allegedly violated by the City. There is a regulatory-takings claim, alleging that the City of Jackson deprived Urban Developers of property when it took the economic use of its land, without taking the land itself, by erroneously applying an otherwise-valid flood-plain ordinance that prevented rehabilitation and repairs at the apartments.

B. The Federal Takings Claim

The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q.R. Co. v. Chicago*, 17 S.Ct. 581, 584 (1897), directs that "private

---

[6] The breach of duties or warranties of good faith and fair dealing, negligence and tortious interference claims against the City, on which Urban Developers lost below, are not also dismissed without prejudice, since pendent-party jurisdiction still exists.

property" shall not "be taken for public use, without just compensation." Before addressing the merits of any appeal, however, this court must be convinced that the claim in question is ripe, even if neither party has raised the issue. *See Samaad v. City of Dallas*, 940 F.2d 925, 933 (5th Cir. 1991). Ripeness is a question of law that implicates this court's subject matter jurisdiction, which we review *de novo*. *Sandy Creek Investors, Ltd. v. City of Jonestown, Tex.*, 325 F.3d 623, 626 (5th Cir. 2003); *Groome Res. Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 198-99 (5th Cir. 2000).

The Supreme Court has adopted a two-prong test for ripeness under the Fifth Amendment's Takings Clause, explaining that such claims are not ripe until (1) the relevant governmental unit has reached a final decision as to how the regulation will be applied to the landowner; and (2) the plaintiff has sought compensation for the alleged taking through whatever adequate procedures the state provides. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 105 S.Ct. 3108, 3116, 3121 (1985). In adopting the first prong, the Court explained its reluctance to hear premature takings claims as follows:

> "this Court consistently has indicated that among the factors of particular significance in the [*Penn Central*] inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it

15

> will apply the regulations at issue to the particular
> land in question."

*Williamson County*, 105 S.Ct. at 3118-19 (citations omitted).

For example, in *Penn Central* the Court declined to hold that New York City's Landmarks Preservation Law effected a taking as applied to Grand Central Terminal, reasoning that although the City had disapproved a plan for a 50-story building above the terminal, the property owners had not sought approval for an alternative plan, and it was therefore uncertain whether the City would disapprove of all economically beneficial uses of the land. *Penn Central Transp. Co. v. New York City*, 98 S.Ct. 2646, 2665–66 (1978); *see also Agins v. City of Tiburon*, 100 S.Ct. 2138 (1980), overruled on other grounds by *First English Evangelical Lutheran Church v. Los Angeles County*, 107 S.Ct. 2378 (1987) (rejecting a takings claim as unripe because the property's owner had not submitted a plan for development). This means that even if a plan is initially disapproved by the government, property owners must then seek variances or waivers, when potentially available, before a court will hear their takings claims. *Williamson County*, 105 S.Ct. at 3117; *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 101 S.Ct. 2352, 2371 (1981). This court has also held that whenever the property owner has ignored or abandoned some relevant form of review or relief, such that the takings decision cannot be said to be final, the takings claim should be dismissed as unripe. *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1041

16

(5th Cir. 1998).

Urban Developers' regulatory takings claim, that the City erroneously applied an otherwise valid flood plain ordinance, is unripe under this first prong. When Urban Developers was notified that the Mod Rehab contracts wouldn't be renewed, it suspended its plans to rehabilitate Town Creek and abandoned all avenues of review that were available to it. *See Hidden Oaks*, 138 F.3d at 1041. Shaikh admitted this at trial, explaining that "our intention to repair the property was really contingent upon us having income at the property once we repaired it." Urban Developers submitted two building plans for approval by the City, both of which were rejected because they did not comply with the City's flood-zone ordinance. After this rejection, although represented by counsel, Urban Developers neither applied for a floodplain-development permit, nor pursued mandamus against the City's community development officer, nor availed itself of the appeal process set forth in the City of Jackson municipal code, which provides any person affected by an order issued by a housing official with an appeal to the circuit court of the First Judicial District of Hinds County.[7] Like the Court in *Penn Central*, we

---

[7] This appeal procedure is mandated by the State of Mississippi pursuant to its Slum Clearance Statute, which provides that "[a]ny person affected by an order issued by the public officer may apply to the circuit court for an injunction restraining the public officer from carrying out the provisions of the order . . . ." Miss. Code Ann. § 43-35-111 (2001). More generally, Mississippi also provides for an appeal to a circuit court for "[a]ny person aggrieved by a judgment or decision of

17

cannot evaluate the extent to which the City has interfered with Urban Developers' reasonable investment-backed expectations because no final decision has been made, nor even sought, regarding the application of the flood-zone ordinance. Accordingly, we dismiss as unripe Urban Developers' regulatory takings claim against the City of Jackson.

The Mississippi Takings Clause, like its federal counterpart, has also been interpreted to require finality. *See Dunston v. Mississippi Dep't of Marine Res*., 892 So.2d 837, 843 (Miss. App. 2005) (citing *Everitt v. Lovitt*, 192 So.2d 422, 428 (Miss. 1966)) ("The Dunstons never filed for, and subsequently were never denied, a permit to develop their property. Since the Dunstons have not exhausted all administrative remedies available to them this Court does not have jurisdiction to hear this claim, as it is unripe for judicial review."). *Cf. San Remo Hotel v. City and County of San Francisco*, 125 S.Ct. 2491, 2506 (2005) ("It was settled well before *Williamson County* that a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.") (internal quotation omitted).

To the extent that Urban Developers may have ever alleged

the board of supervisors, or municipal authorities of a city, town, or village . . . ." Miss. Code Ann. § 11-51-75 (2001).

18

below an ordinary takings claim against the City, in addition to and as distinguished from the above described regulatory takings claim, it does not appear that any such claim against the City under the Fifth Amendment's Takings Clause (or under the comparable provision of Art. III, § 17, of the Mississippi Constitution) was ever submitted to the jury. Moreover, any such ordinary takings claim would in any event also fail the first ripeness prong. The City has not made a final decision on whether to condemn the property, and has done nothing more than state its intent to proceed with condemnation. The Town Creek Apartments were still vacant and not condemned when suit was filed, and, as of the date of oral argument, so they remain. There has never been any actual physical taking (or occupation) of, or any actual physical damage to, the Town Creek Apartments, or any part thereof, by the City. Here we have only a threat to use the City's legal powers, and a mere threat does not constitute a taking, since a non-regulatory taking requires actual government confiscation or physical occupation. *See Shaikh v. City of Chicago*, 341 F.3d 627, 632 (7th Cir. 2003) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 122 S.Ct. 1465, 1478–79 (2002)). Furthermore, because a violation of the Takings Clause does not occur until just compensation is denied, any such ordinary takings claim by Urban Developers would likewise be unripe under the second prong of *Williamson County*, which requires the plaintiff to have sought compensation for the alleged taking through whatever *adequate*

19

procedures the state provides before seeking to interpose the federal courts, through section 1983, between a state and its citizen. *Williamson County*, 105 S.Ct. at 3121.[8] Under this second prong, the property owner bears the burden of proving that state law proceedings are unavailable or inadequate. *Williamson*, 105 S.Ct. at 3122; *see also Samaad*, 940 F.2d at 934 ("'[I]nadequate' procedures are those that *almost certainly* will not justly compensate the claimant."). Urban Developers has not discharged that burden here. Mississippi law provides for inverse-condemnation actions, *see, e.g.*, *City of Gulfport v. Anderson*, 554 So.2d 873, 874 (Miss. 1989),[9] yet Urban Developers has not sought compensation through Mississippi law for the alleged taking. *See Bryan v. City of Madison, Miss.*, 213 F.3d 267, 276 n.16 (5th Cir. 2000) (rejecting a takings claim as unripe because the property owner had not first resorted to Mississippi's court of eminent domain).

---

[8] This ripeness requirement follows naturally from the Fifth Amendment itself, which proscribes the taking of "property . . . *without just compensation*." U.S. Const. amend. V (emphasis added). *But see San Remo Hotel v. City and County of San Francisco,* 125 S.Ct. 2491, 2508 (2005) (Rehnquist, C.J., joined by O'Connor, Kennedy, and Thomas, JJ., concurring in the judgment) ("It is not clear to me that *Williamson County* was correct in demanding that, once a government entity has reached a final decision with respect to a claimant's property, the claimant must seek compensation in state court before bringing a federal takings claim in federal court.").

[9] *See also* Miss.Code Ann. § 43-37-9 (2001) (providing costs and attorneys' fees to successful plaintiffs in inverse-condemnation actions).

C.   Remaining Constitutional Claims against the City

Urban Developers also brought claims against the City for violations of procedural due process under the United States and Mississippi Constitutions.  These claims focus on the statements that the apartments would be condemned and regarding the failure to approve plans for rebuilding, all without a hearing and without giving notice of deficiencies.  We dismiss these remaining constitutional claims under general ripeness principles.[10]

A court should dismiss a case for lack of ripeness "when the case is abstract or hypothetical." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987).  "The key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 87 S.Ct. 1507, 1515 (1967)). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United*

---

[10]   Both Mississippi constitutional claims are best understood in light of their respective United States Constitution counterparts, although the Takings Clause of the Mississippi Constitution provides somewhat broader protection of private property rights than the Takings Clause of the United States Constitution.  Miss. Const. Art. III, § 17 ("Private property shall not be taken *or damaged* for public use, except on due compensation . . . .") (emphasis added)*; see also Gilich v. State Highway Comm'n*, 574 So.2d 8, 11 (Miss. 1990).  The federal and Mississippi due processes clauses, on the other hand, although worded slightly differently, are implemented identically.  *Compare*  U.S. Const. amend. XIV *with* Miss. Const. Art. III, § 14*; see also Tucker v. Hinds County*, 558 So.2d 869, 873 (Miss. 1990).

21

*States*, 118 S.Ct. 1257, 1259 (1998).

Urban Developers' federal and state due process claims against the City are unripe because, as discussed above, Urban Developers has yet to suffer a deprivation of property. The City of Jackson has not made a final determination of whether, or under what circumstances, it will issue a building permit, or whether it will condemn the property. These due process claims rest upon a contingent future event and cannot be properly evaluated by this court in the present circumstances. *See Bigelow v. Michigan Dep't of Natural Res.*, 970 F.2d 154, 160 (6th Cir.1992) ("Until the state courts have ruled on the plaintiffs' inverse condemnation claim, this court cannot determine whether a taking has occurred, and thus cannot address the procedural due process claim with a full understanding of the relevant facts.").

We reach this conclusion, like Fifth Circuit panels before us, not by direct reference to *Williamson County*, a case which other circuits have applied to ancillary due-process claims in such circumstances,[11] but rather by reference to principles of ripeness generally. *See John Corp. v. City of Houston*, 214 F.3d 573, 586 (5th Cir. 2000) ("[W]e do not apply *Williamson County* per se [to the procedural due process claim], but rather the general rule that a claim is not ripe if additional factual development is

---

[11]  *See, e.g.*, *Bigelow*, 970 F.2d at 160; *Taylor Inv., Ltd. v. Upper Darby Tp.*, 983 F.2d 1285, 1293 (3d Cir. 1993); *Herrington v. Sonoma County.*, 857 F.2d 567, 569 (9th Cir. 1988).

22

necessary."); *see also Hidden Oaks Ltd.*, 138 F.3d at 1045 n.6 (refusing to apply *Williamson County* to a procedural due process claim because there was no primary takings claim present). *But see Smith v. City of Brenham*, 865 F.2d 662, 664 (5th Cir. 1989) (citing *Williamson County* and concluding that the plaintiff's due process challenge to landfill permitting procedures was "premature" because "no deprivation of property . . . has yet occurred . . . and certainly will not occur at least until the permit process . . . has run its course.").

We accordingly dismiss as unripe all of Urban Developers' claims on which it prevailed below against the City of Jackson.

II. Claims Against the MRHA, Murphy, and Wilson

At the close of the evidence, the jury found for Urban Developers on the following claims against the MRHA or its defendant officers, Murphy and Wilson: (1) a breach of contract claim against the MRHA; (2) a federal takings claim against the MRHA and Murphy; (3) a federal procedural due-process claim against the MRHA and Murphy; (4) a Mississippi takings claim against the MRHA and Murphy; (5) a Mississippi procedural due process claim against the MRHA and Murphy; and (6) a negligence claim under the Mississippi Tort Claims Act against the MRHA, Wilson, and Murphy. The jury awarded damages of $1,000,000.00, and the district court rendered judgment on the verdict awarding Urban Developers $1,000,000 damages, and $118,406 attorney's fees, against the MRHA, Wilson and Murphy, jointly and severally. The

23

MRHA, Wilson and Murphy appeal, challenging the sufficiency of the evidence as well as the court's subject-matter jurisdiction.

A.   Standard of Review

All defendants moved for judgment as a matter of law both at the close of the plaintiff's case and again after the jury's verdict.  In deciding such motions, the district court applies the standard established in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (*en banc*), overruled on other grounds, 107 F.3d 331, 336 (5th Cir. 1997), and on appeal from such decisions, this court applies that same standard.  *Hiltgen v. Sumrall*, 47 F.3d 695, 699-700 (5th Cir. 1995).  *Boeing* instructs us to:

> "consider all of the evidence—not just that evidence which supports the non-movers case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion.  If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper."  411 F.2d at 374.

However, the court cautioned that "a mere scintilla of evidence is insufficient to present a question for the jury. . . . There must be a conflict in substantial evidence . . . ." *Id*. at 374-75.  This court does not evaluate witness credibility and "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 120 S.Ct. 2097, 2110 (2000); *see also* 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, at 300 (2d ed. 1995); *Ham Marine,*

24

*Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 461 (5th Cir. 1995) ("Unless there was no credible evidence presented which might authorize the verdict, the jury's findings must stand."). Questions of law, however, including determinations of subject-matter jurisdiction, are reviewed *de novo*. *USX Corp. v. Tanenbaum*, 868 F.2d 1455, 1457 (5th Cir. 1989).

B.  Breach of Contract Claim against the MRHA

The MRHA disputes the jury's finding that the Mod Rehab contracts were validly assigned to Urban Developers from the Mitchell Company.  "The interpretation of a contract is a question of law and the appellate court is not bound by the  . . . standard of review [for fact findings] unless ambiguities require the court to consult extrinsic evidence." *Tri-State Petroleum Corp. v. Saber Energy, Inc.*, 845 F.2d 575, 581-82 (5th Cir.1988).  Where the very existence of the contract is at issue, however, review for sufficiency of the evidence is appropriate.  Once a contract has been found and its essential terms have been identified and determined to be enforceable, the issue of breach is another question of fact, subject to review for substantial evidence. *Ham Marine*, 72 F.3d at 461.

We agree with the MRHA's contention that there is insufficient evidence of valid contract assignment from the Mitchell Company to Urban Developers, and that the purported assignment was void.  The MRHA argued at trial that it had no contractual obligations to

25

Urban Developers because the Mod Rehab contracts contained a prohibition against assignment without written permission, which the Mitchell Company never received before purporting to assign its rights and duties under the contracts to Urban Developers. MRHA further argues that even if the oral permission were sufficient to modify the contracts, it was invalid because Mississippi law requires all government board actions to be taken publicly and spread upon the minutes of the board meetings.

The Mississippi Supreme Court has long held that "boards of supervisors and *other public boards* speak only through their minutes . . . ." *Thompson v. Jones County Cmty. Hosp.*, 352 So.2d 795, 796 (Miss. 1977) (emphasis added); *see also Bridges v. Bd. of Supervisors of Clay County*, 58 Miss. 817 (1881). No cases directly address whether a public housing authority qualifies as such a public board, so we turn to that question first. Based on a review of the MRHA's organic statute, Mississippi case law, and the rationale underlying the "spread upon the minutes" requirement, we hold that it is.

The Housing Authority Act, Miss. Code Ann. § 43-33-1 et seq., established, in every city and county of the state of Mississippi, "a public body corporate and politic to be known as the 'housing authority.'" Id. § 43-33-5. The legislature later provided procedures by which these local housing authorities might consolidate into larger, regional housing authorities, such as the MRHA. Miss. Code Ann. § 43-33-103 et. seq. The board of

supervisors of each county that is comprised in this regional housing authority is entitled to appoint a commissioner to the housing authority's board. Miss. Code Ann. § 43-33-115. The commissioners' qualifications, length of term, quorum and voting requirements, and compensation are all established by law. Miss. Code Ann. § 43-33-7; 43-33-49.

These housing authorities are created in "perpetual succession" to "exercis[e] public and essential government functions," and, as public state bodies created by statute, they have no power or authority except that granted by statute. Miss. Code Ann. § 43-33-11. Finally, "[t]he property of an authority is declared to be public property used for essential public and governmental purposes and such property of an authority shall be exempt from all taxes . . . ." Miss. Code Ann. § 43-33-37.

The Mississippi Supreme Court has not limited the public minutes requirement to only county boards of supervisors. In *Thompson*, the Mississippi high court applied the minutes requirement to invalidate an employment contract that was not spread upon the minutes of a county hospital's board of trustees, dismissing the plaintiff's claim of $160,764.80 in unpaid salary, and warning "[i]t was the responsibility of the plaintiff to see that the contract was properly recorded on the minutes." 352 So.2d at 798. More recently, in *Tupelo Redevelopment Agency v. Abernathy*, the Mississippi Supreme Court impliedly suggested that the minutes requirement would apply to an urban renewal agency

27

created by the City of Tupelo. 913 So.2d 278, 288 (Miss. 2005). The organic statute that creates such urban renewal agencies, Miss. Code Ann. § 43-35-3 et. seq., contains implementing language identical to that found in the Housing Authority Act. *See, e.g.*, Miss. Code Ann. § 43-35-33 ("There is hereby created in each municipality a public body corporate and politic to be known as the 'urban renewal agency.'. . ."); *see also* Miss. Code Ann. § 43-33-7 (establishing the term, voting requirements, and compensation for the board of commissioners).

Only once has the Mississippi Supreme Court expressly addressed whether an "other" public board was bound by the minutes requirement. *Rawls Springs Util. Dist. v. Novak*, 765 So.2d 1288, 1291 (Miss. 2000). In that case, the court invalidated a contract that was not spread upon the minutes of a water utility district's board of commissioners, noting that "[a]s the District Board is a public corporation and body politic, we conclude that the District Board's action[s] fall under those generally recognized holdings that limit such bodies to speak and act only through their minutes." *Id.* In so concluding, the court quoted implementing language from the water district's organic statute, Miss. Code Ann. § 19-5-151 et. seq., language that is nearly identical to that found in the Public Housing Act. *See Novak*, 765 So.2d at 1291 ("The District Board is a public corporation . . . and is 'a body politic and corporate with power of perpetual succession.'") (quoting Miss. Code Ann. § 19-5-165).

28

We also find support for our holding in the reasons that support the rule requiring the acts of public boards to be reflected in their minutes. The Mississippi Supreme Court has stated these reasons as follows:

> "(1) That when authority is conferred upon a board, the public is entitled to the judgment of the board after an examination of a proposal and a discussion of it among the members to the end that the result reached will represent the wisdom of the majority rather than the opinion or preference of some individual member; and (2) that the decision or order when made shall not be subject to the uncertainties of the recollection of individual witnesses of what transpired, but that the action taken will be evidenced by a written memorial entered upon the minutes at the time, and to which all the public may have access to see what was actually done."

*Novak*, 765 So.2d at 1291–92 (quoting *Lee County v. James*, 174 So. 76, 77 (Miss. 1937); *see also Thompson*, 352 So.2d at 796. These reasons apply with full force to the board of commissioners for the public housing authorities, who act as custodians of "public property" and are vested by the people of Mississippi with the power to exercise "public and essential government functions" consistent with quorum and voting requirements established by statute.

Having concluded that MRHA is bound by the minutes requirement, we now determine whether that requirement renders the unapproved contractual assignment void. We hold that it does.

The Mississippi Supreme Court has characterized the minutes requirement as "an important public policy issue," cautioning that

29

"public interest requires adherence thereto, notwithstanding the fact that in some instances the rule may work an apparent injustice." *Butler v. Bd. of Supervisors for Hinds County*, 659 So.2d 578, 579 (Miss. 1995) (quoting *Colle Towing Co. v. Harrison County*, 57 So.2d 171, 172 (Miss. 1952)). Indeed, "the policy of protecting the public's funds for use by and for the public is paramount to other individual rights which may also be involved." *Butler*, 659 So.2d at 579; *see also id.* at 581 (discussing Mississippi's "past strict adherence to the requirement that a board of supervisors only be bound by a contract entered upon its minutes") and *Warren County Port Comm'n v. Farrell Constr.*, 395 F.2d 901, 904 (5th Cir. 1968) (describing the Mississippi requirement as "stringent").

This requirement applies not only to contract formation, but to contract modification as well. *Farrell Constr.*, 395 F.2d at 903-04 ("The only permissible method for the alteration of a contract with a board of supervisors is by a subsequent order entered on its minutes") (citing *Lamar County v. Talley & Mayson*, 77 So. 299 (Miss. 1918). Moreover, in *Butler*, the Mississippi Supreme Court held that the assignment of contract proceeds from a general contractor (who had contracted with the board) to a subcontractor (who had contracted only with the general contractor) had effectuated a contract alteration, rendering the assignment invalid because its approval had not been spread upon the minutes

30

of the board. *Butler*, 659 So.2d at 580–81.

Applying these principles to our facts, we find no evidence of a valid assignment of the HAP contracts from the Mitchell Company to Urban Developers. Following the court in *Butler*, we hold that the minutes requirement does apply to the purported assignment here. For in *Butler*, the court held that an assignment of a right to mere proceeds was a contractual modification that implicated the minutes requirement, a closer question, we believe, than the assignment at issue here, where the Mitchell Company purported to assign both its rights *and duties* under the HAP contracts to Urban Developers.

Moreover, there is no evidence spread upon the minutes of the MRHA's board of commissioners that they approved the assignment. Not only was there undisputed testimony at trial in this respect, but there was also undisputed testimony that the Board had never so much as made reference to the HAP contracts during the relevant time period. In fact, the only action taken by the board that affected the HAP contracts was the resolution approving the Fiscal Year 2002 budget, on July 15, 2001, which declined to request further funding from HUD for those contracts.

Urban Developers argues in response that, even if the assignment is legally void, the Board should be estopped in equity from denying it.[12] Urban Developers notes that the officers of the

_____

[12] The jury was charged that a contract could be established either by a signed writing or by an oral agreement or by

31

MRHA made oral promises that the Mod Rehab contracts could be assigned to Urban Developers, and that, after the transfer, the MRHA continued to make rent subsidy payments to "Town Creek" and to demand compliance with the federal housing quality standards. Finally, Urban Developers notes that during the rental dispute, all letters from the MRHA were addressed to its principle member, Shahid Shaikh.

The general rule, however, is that "[s]uch contracts when so entered upon the minutes may not be varied by parol *nor altered by a court of equity*." *Farrell Constr.*, 395 F.2d at 904 (emphasis added) (citing *McPherson v. Richards*, 98 So. 685 (Miss. 1924)). The plaintiff's invocation of equities to meet the "spread upon the minutes" requirement is usually prohibited, in part, because "each person, firm or corporation contracting with a board of supervisors is responsible to see that the contract is legal and properly recorded on the minutes of the board." *Thompson*, 352 So.2d at 797; *see also id.* at 798 ("It was the responsibility of the plaintiff to see that the contract was properly recorded on the minutes"). The *Colle Towing* case is often cited as an example of the harsh application of Mississippi's spread on minutes requirement, equity notwithstanding. There, the Harrison County Board of Supervisors'

"equitable estoppel" and the charge defined equitable estoppel. In answer to interrogatory 4 it found that "the contracts were in effect between the Housing Authority and Urban Developers, LLC at the time of the flood;" and, in answer to interrogatory 5, it found "For Plaintiff" on "Plaintiff's breach of contract claim against the Housing Authority."

president entered into an oral contract (later conceded to be invalid) with Colle Towing to perform emergency repairs on a drawbridge across the back bay of Biloxi. The board subsequently ratified the oral contract upon its minutes and began partial payment. After a dispute arose over the amount due, Colle Towing sued the Board in *quantum meruit*[13] and the district court dismissed. The Supreme Court of Mississippi affirmed, holding that:

> "It has been repeatedly held in this State that a board of supervisors can contract and render the county liable only by a valid order duly entered upon its minutes, that all persons dealing with a board of supervisors are chargeable with knowledge of this law, that a county is not liable on a *quantum meruit* basis even though it may have made partial payments on a void oral contract, and, moreover, that in such case *there is no estoppel against the county*."

*Colle Towing*, 57 So.2d at 172 (citations omitted) (emphasis added).

More recently, the Mississippi Supreme Court again declined to estop a public board, this time a public utility district. *Rawls Springs Utility District v. Novak*, 765 So.2d 1288, 1292 (Miss. 2000). The president and chief executive officer of the utility district, Bryant, had entered into an oral agreement with a

---

[13] The Supreme Court of Mississippi has held that claims arising in *quantum meruit* are equitable in nature, *Poole v. Gwin, Lewis & Punches, LLP*, 792 So.2d 987, 991 (Miss. 2001), and in this case we are bound by the court's holding. We note, however, that this is a question on which reasonable chancellors may disagree. *See Webb v. B.C. Rogers Poultry, Inc.*, 174 F.3d 697, 704 (5th Cir. 1999) (holding, over a dissent by Judge Politz, that *quantum meruit* arises in law).

developer, Novak, for the utility district's maintenance staff to install thirty-two water meters at Novak's trailer park. *Id.* at 1290. Bryant and Novak agreed to a price of $50 per installation, an agreement which was contrary to, and purported to modify, the utility district's regulations, which provided for a charge of $300 per installation. *Id.* During the following six years, the utility district billed Novak thirty-two times at the $50 rate, and Novak promptly made payment.

When the district board became aware of the oral agreement, they demanded back-payment from Novak for the already-installed meters. The Supreme Court of Mississippi reversed the chancellor's ruling that the board was estopped from asserting a claim for back payment, holding that:

> "Bryant, and not the District Board, properly speaking through its minutes, entered into the subject agreement with Novak. Although Bryant may be said to be estopped from asserting a claim inconsistent with his representation to Novak, the District Board itself never spoke through its minutes to authorize meter installations for $50. The District Board has not changed its position or done other acts to justify the imposition of equitable estoppel. The District Board is not attempting to deny what it previously induced another party to believe and take action on. Nor is the District Board guilty of acts or declaration designed to induce another to alter his position injurious to himself."

*Id.* at 1292.

Urban Developers' best case is *Cmty Extended Care Ctrs. v. Bd. of Supervisors for Humphreys County*, a case in which the

34

Mississippi Court of Appeals equitably estopped a county board of supervisors from arguing that the "technical omission" of not having the lease contract itself "spread across the minute book" should invalidate the lease contract. 756 So.2d 798, 804 (Miss. App. 1999).[14] In that case, Community Care Extended Centers (CECC) offered to lease a nursing home from the Humphreys County Board of Supervisors. The Board then responded to the offer with a detailed resolution, reflected in the minutes, describing the property to be leased and authorizing the president of the Board to execute *that specific lease*. In accordance with the resolution, a 20-year lease was signed between the president of the Board and CECC. "The lease contract was filed in the land records of the chancery clerk. The minute book and records of the board of supervisors are maintained by the chancery clerk." *Id*. at 802. Seven years later, on two separate occasions, the Board expressly acknowledged the existence of the lease contract with CECC by approving, upon its minutes, detailed amendments to the lease. Six years after the amendments, the Board notified CECC that it considered the lease contract void,

---

[14] Urban Developers also cites a line of cases that broadly applies equitable estoppel against public boards. *See, e.g.*, *Bd. of Educ. of Lamar County v. Hudson*, 585 So.2d 683, 688 (Miss. 1991) (holding that a public board "may be equitably estopped under the proper circumstances"). These cases, however, are not controlling here, as they do not involve the strict Mississippi minutes requirement, but instead simply permit equitable estoppel to be enforced against a board in other contexts, for example, as through the doctrine of after-acquired title. *E.g.*, *Oktibbeha County Bd. of Educ. v. Town of Sturgis*, 531 So.2d 585, 589 (Miss. 1988).

35

threatening to repossess the nursing home unless CECC agreed to renegotiate.

The court of appeals first held that the minutes requirement had been satisfied, explaining that "the lease contract was entered sufficiently into the Board's minutes to bind the Board to its terms and conditions." *Id.* at 801. The court explained, "Looking at the minutes of the Board throughout the thirteen year period the lease contract has been in effect, we find sufficient evidence of the Board's intent to be bound by the lease contract." *Id.* at 802. And further, "In this case, there was a substantial entry [in the minutes]—a resolution that authorized the president to execute 'the original lease' that inferentially was physically presented to the Board and was recorded less than two weeks later." *Id.* at 803.

Then, in the alternative, the court applied equitable estoppel against the Board, holding that the resolutions passed by the board, as detailed above, were sufficient to estop the Board from denying its existence. *Id.* at 804. In conclusion, the court of appeals noted that although "no estoppel may be enforced 'against the state or its counties where the acts of their officers were unauthorized,' . . . the resolution entered on the Board minutes shows the supervisors unanimously approved the lease contract with CECC and authorized the Board president to sign the lease contract on behalf of the Board." *Id.* at 804.

The facts of our case far more closely resemble *Novak* than

*CECC*. There is no evidence that the MRHA's board of commissioners even knew of the existence, let alone approved, the assignment from the Mitchell Company to Urban Developers (or any other assignment). The only evidence in the record that supports Urban Developers' position, is a resolution passed by the board of commissioners and entered upon its minutes in 1984, sixteen years before Urban Developers was even formed, which states "RESOLVED, that the Chairman and Executive Director of the Authority are hereby authorized to execute all documents necessary to participate in the Rental Rehabilitation Program." MRHA Minutes of the Board of Commissioners 287 (Feb. 15, 1984).

This resolution is far less connected to the matter in question than the three resolutions upon which the court of appeals in *CECC* relied to enforce equitable estoppel against the Humphreys County board of supervisors. There, the resolutions authorized the president to execute a specific document, relating to a specific transaction. Then, when amendments to the lease contract were necessary, the board approved those amendments through resolutions spread upon their minutes. Here, where a contractual modification was also necessary to assign the rights and duties of the Mitchell Company to Urban Developers, the plaintiff never sought approval of the Board, and instead relied on the oral promises only of Wilson and Murphy.

In this respect, our case resembles *Novak*. For although it might be said that Wilson and Murphy can be estopped from asserting

37

a claim inconsistent with their representation to Urban Developers, the Board itself "never spoke through its minutes to authorize" the assignment. *Novak*, 765 So.2d at 1292. The Board "has not changed its position or done other acts to justify the imposition of equitable estoppel." *Id.* The Board "is not attempting to deny what it previously induced another party to believe and take action on." *Id.* Nor is the Board "guilty of acts or declaration designed to induce another to alter his position injurious to himself." *Id.*

Accordingly, we reverse the district court's denial of the MRHA's motion for judgment as a matter of law on Urban Developers' breach of contract claim. The assignment of the HAP contracts from the Mitchell Company to Urban Developers was void.

C.  Federal Takings Claims against the MRHA and Murphy

Urban Developers asserts that when the MRHA defendants issued vouchers to the Town Creek residents, and then arbitrary forced the tenants to use the vouchers elsewhere, the result was "the breaking of the leaseholds between the tenants and the plaintiff, which resulted in the taking of those [lease] contracts." Because Urban Developers has yet to be denied compensation for this taking by the state of Mississippi (principally because they have not sought such compensation through Mississippi procedures), we hold that these federal takings claims are not yet ripe for review.

As discussed above, because a violation of the Fifth Amendment's Takings Clause does not occur until just compensation is denied, *Williamson County* requires the plaintiff to have sought

38

compensation for the alleged taking through whatever adequate procedures the state provides. *Williamson County*, 105 S.Ct. at 3120. Furthermore, this court has held that the unsettled status of state law does not render the available procedures inadequate; that is "it must be certain that the state would deny that claimant compensation were he to undertake the obviously futile act of seeking it." *Samaad*, 940 F.2d at 934. On this issue, the plaintiff bears the burden of persuasion. *Id.*

Urban Developers again has not discharged that burden here. The MRHA clearly wields the power of eminent domain, Miss. Code Ann. § 43-33-19, and the State of Mississippi has long provided for actions in inverse condemnation. *See, e.g.*, *Wright v. Jackson Mun. Airport Auth.*, 300 So.2d 805 (Miss. 1974); *City of Gulfport v. Anderson*, 554 So.2d 873 (Miss. 1989). Moreover, since the Mississippi courts have interpreted Mississippi's Takings Clause in light of the federal Takings Clause, the courts of Mississippi also provide plaintiffs with a cause of action for regulatory takings. *See, e.g.*, *Walters v. City of Greenville*, 751 So.2d 1206, 1210–11 (Miss. App. 1999) (citing *Penn Central* with approval); *Tippitt v. City of Hernando*, 909 So.2d 1190, 1193–94 (Miss. App. 2005). It is an unsettled question, of course, the extent to which many jurisdictions will recognize as protected by the Takings Clause a

property right in contract,[15] yet the plaintiff has identified nothing, and we have found nothing, to suggest that Mississippi law "unquestionably would afford them no remedy." *Samaad*, 940 F.2d at 935. Accordingly, the plaintiff's federal takings claims against the MRHA and Murphy are unripe, and the district court was without jurisdiction to consider them.

D. State Takings Claims against the MRHA and Murphy

The plaintiff's state takings claims are a different matter. We reach the merits of the plaintiff's state takings claims, because, unlike the federal takings claims just discussed, *Williamson County* does not directly apply, and, unlike the state takings claims against the City of Jackson, the relevant government entity here has made a final decision as required by Mississippi law.[16]

---

[15] *See United States v. Sec. Indus. Bank*, 103 S.Ct. 407, 410-412 (1982); *Eastern Enters. v. Apfel*, 118 S.Ct. 2131, 2156-58 (1998) (Kennedy, J., concurring in the judgment and dissenting in part). *See also* Thomas W. Merrill, *The Landscape of Constitutional Property*, 86 Va. L. Rev. 885, 990-96 (2000).

[16] This case is distinguishable from *Samaad*, where we dismissed a state takings claim for lack of jurisdiction, holding that such a claim could not be used to ripen a federal takings claim when brought in the same suit. *Samaad*, 940 F.2d at 934. That holding rested, in part, upon the explanation that once the federal takings claim was dismissed as unripe, the court lost its sole basis of supplemental jurisdiction. 28 U.S.C. § 1367(a) (2005). In this case, however, the plaintiffs have stated a minimally colorable federal claim of deprivation of property without due process, invoking this court's federal question jurisdiction and providing an independent basis for the exercise of supplemental jurisdiction over the state takings claims. We see no reason to treat these state *takings* claims as different

We nevertheless hold that the MRHA's actions did not effect a taking, regulatory or otherwise. The MRHA did not force the Town Creek tenants to abandon their leases, nor can it be said that the MRHA's issuance of vouchers interfered with Town Creek's reasonable investment-backed expectations. The tenants were simply given an option to either accept the voucher and use it elsewhere, or to decline the voucher and remain under their leases at Town Creek. It is, in fact, undisputed that a few tenants did remain at Town Creek, and that the MRHA continued to subsidize their leases through the existing Mod Rehab program. We find that, as a matter of law, the evidence does not suffice to show that the tenants' leases were taken by the MRHA's issuance of housing-choice vouchers in the aftermath of the flood. Accordingly, we reverse the district court's denial of the MRHA and Murphy's motion for judgment as a matter of law on the Mississippi takings claims.

E. State and Federal Procedural Due Process Claims against the MRHA and Murphy

Plaintiffs seeking protection under the federal Due Process Clause must first establish that they have a protected property interest. *See Bd. of Regents of State Colleges v. Roth*, 92 S.Ct. 2701, 2709 (1972)*; see also American Mfrs. Mut. Ins. Co. v.*

from any other state claim. *See Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 385–86 (5th Cir. 2001). *But see Koscielski v. City of Minneapolis*, 435 F.3d 898, 903 (8th Cir. 2006) (dismissing both federal *and* state takings claims as unripe under the "adequate state procedures" prong of *Williamson County*, despite the presence in the lawsuit of an independent basis for supplemental jurisdiction).

41

*Sullivan*, 119 S.Ct. 977, 989 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"). The Mississippi Due Process Clause, although worded differently from the Federal version, is implemented identically. *Compare* U.S. Const. amend. XIV *with* Miss. Const. Art. III, § 14; *see also Tucker v. Hinds County*, 558 So.2d 869, 873 (Miss. 1990).

We must first, then, identify which of the plaintiff's protected property interests, if any, were violated without due process, and, because the Constitution protects rather than creates such property interests, their existence must be determined by reference to "'rules or understandings that stem from an independent source such as state law.'" *Phillips v. Washington Legal Found.*, 118 S.Ct. 1925, 1930 (1998) (quoting *Roth*, 92 S.Ct. at 2709); *see also Bishop v. Wood*, 96 S.Ct. 2074, 2077 (1976) ("[T]he sufficiency of the claim of entitlement must be decided by reference to state law.").

Urban Developers alleged that three unique property interests were violated by the MRHA. First, they alleged that the MRHA deprived Urban Developers of its property interest in the HAP contracts when the MRHA breached those contracts by failing to conduct formal inspections and allowing the plaintiff time to make repairs. Because we have held, *supra*, that Urban Developers had no such contractual rights under Mississippi law, Urban Developers

42

could not have been deprived of the HAP contracts (or rights thereunder) without due process.

Urban Developers' second due process claim was that the MRHA deprived Urban Developers of its property interest in the ACC contract between the Housing Authority and HUD, as well as its interest in HUD regulations which the ACC contracts reference. Because we agree with the cases which hold that landlords are not third-party beneficiaries of the ACC contract, and because this court has already held that landlords are not within the zone-of-interest of the HUD regulations, Urban Developers could not have been deprived without due process of any interest in the ACC contracts or the relevant HUD regulations.[17]

---

[17] *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1436 (Fed.Cir. 1997) (affirming the trial court's conclusion that "the third party beneficiaries of the ACCs are the tenants and not the property owners"); *Ashton v. Pierce*, 716 F.2d 56, 66 (D.C.Cir. 1983) ("[I]t is difficult to imagine any purpose for the [Annual Contribution] Contract other than to benefit the tenants of public housing."), *modified on other grounds*, 723 F.2d 70 (D.C.Cir. 1983); *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed.Cir. 1994) ("If there is a third party beneficiary at all, it is probably the low-income tenants . . ."); *see also Gomez v. Hous. Auth. of City of El Paso*, 805 F.Supp. 1363, 1368 (W.D.Tex.1992) ("'[T]he purpose of the [ACC] is to benefit public housing tenants . . . .'") (quoting *Henry Horner Mothers Guild v. Chicago Hous. Auth.*, 780 F.Supp. 511, 516 (N.D.Ill.1993)), *aff'd* 20 F.3d 1169 (5th Cir. 1994) (table)
*Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356, 363 (5th Cir. 2006) ("Congress plainly expressed its intent to provide housing assistance for the benefit of the low-income families participating in the program; it would be absurd to treat the voucher program as a landlords' relief act!"); *see also* 42 U.S.C. 1437(a)(1)(C) (2001) ("It is the policy of the United States . . . to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, *with appropriate accountability to public*

43

Finally, Urban Developers' third due process claim was that the MRHA deprived them of their interest in their lease contracts with the Town Creek tenants. Because we have held, *supra*, that Urban Developers failed to pursue a post-deprivation remedy, which they have not shown to be unavailable under Mississippi law, we reject this final due process claim as unripe. *See Liberty Mut. Ins. Co. v. Louisiana Dep't of Ins.*, 62 F.3d 115, 118 (5th Cir. 1995) ("The second claim, denial of procedural due process, falls with the [takings] claim. The procedural due process claim fails because Liberty Mutual has not demonstrated that Louisiana does not offer a post-deprivation remedy . . ."). Accordingly, we reverse the district court's denial of the MRHA and Murphy's motion for judgment as a matter of law on the two procedural due process claims relating to an alleged property interest in the Mod Rehab Contract and the Annual Contribution Contract. Because we lack subject matter jurisdiction, we dismiss without prejudice the procedural due process claim relating to a property interest in the lease contracts with the Town Creek tenants.

F.   The Mississippi Tort Claims Act

The jury found the MRHA, Murphy and Wilson negligent under the Mississippi Tort Claims Act for accepting Mayor Johnson's erroneous statements about the impending condemnation of Town Creek and for

---

*housing residents, localities, and the general public.*") (emphasis added).

relying on those statements (without conducting an investigation into their veracity) to issue housing choice vouchers to the Town Creek tenants. The jury considered, yet rejected, an affirmative defense that exempts governmental entities and their employees from tort liability "based upon the exercise or performance [of] . . . a discretionary function or duty . . . whether or not the discretion be abused." Miss. Code Ann. § 11-46-9(d) (2001). We find no conflict in substantial evidence as to whether the issuance of housing vouchers during a declared state of emergency qualifies as a discretionary act under the MTCA, and we accordingly reverse the district court's denial of the MRHA, Wilson's and Murphy's motion for judgment as a matter of law on this question.

"Waiver of a state's sovereign immunity, like waiver of any constitutional right, is strictly construed in favor of the holder of the right. . . . [T]he MTCA's exemptions to Mississippi's waiver should be liberally construed in favor of limiting liability." *In re Foust*, 310 F.3d 849, 864 (5th Cir. 2002) (citations omitted). "The basis for the immunity given to government officials is in the inherent need to promote efficient and timely decision-making without fear of liability. This . . . works to encourage free participation and hinder fear that goes with risk-taking situations and the exercise of sound judgment." *Mississippi Dep't of Transp. v. Cargile*, 847 So.2d 258, 268 (Miss. 2003).

The Mississippi Supreme Court has adopted a two-part analysis for determining when governmental conduct is discretionary: "(1)

45

whether the activity involved an element of choice or judgment; and if so, (2) whether the choice or judgment in supervision involves social, economic or political policy alternatives." *Bridges v. Pearl River Valley Water Supply Dist.*, 793 So.2d 584, 588 (Miss. 2001); *see also City of Jackson v. Powell*, 917 So.2d 59, 73 (Miss. 2005). Conversely, the court has held that governmental conduct is ministerial, and thus not entitled to immunity, if the conduct is "imposed by law, and its performance is not dependent on the employee's judgment." *Cargile*, 847 So.2d at 267.

A wide variety of government conduct has been held to involve the implementation of social, economic or political policy, including the manner in which a police department supervises, disciplines and regulates its police officer, *City of Jackson v. Powell*, 917 So.2d 59, 74 (Miss. 2005); the decision to grant or deny parole, *Doe v. State ex rel. Mississippi Dep't of Corr.*, 859 So.2d 350 (Miss.2003); the placement or non-placement of traffic control devices or signs, *Barrentine v. Mississippi Dep't of Transp.*, 913 So.2d 391 (Miss. App. 2005); the acts or omissions of high school football coach which caused a player to suffer heatstroke during practice, *Harris ex rel. Harris v. McCray*, 867 So.2d 188 (Miss. 2003); and the decision of emergency medical personnel to use a "load and go" approach on an expectant mother. *Sanders v. Riverboat Corp. of Mississippi-Vicksburg*, 913 So.2d 351 (Miss. 2005).

46

On the other hand, where the law expressly proscribes certain conduct, the government official has no discretion to engage in that conduct, and, likewise, where the law expressly requires certain conduct, an official may not, in the exercise of discretion, abstain. *See, e.g.*, *City of Jackson v. Lipsey*, 834 So.2d 687 (Miss. 2003) (where an officer failed to use his siren, as required by law, in response to an emergency dispatch, the discretionary exception was not available); *Coplin v. Francis*, 631 So. 2d 752, 755 (Miss. 1994) (where a governmental entity had failed to build a bridge to certain specifications, as required by statute, the discretionary exception was not available). Furthermore, even when the government official is acting in accordance with a statutory command, such that the official is implementing policy, not making it, the act is ministerial and not entitled to the discretionary exception. *See Barrett v. Miller*, 599 So. 2d 559, 568 (Miss. 1992) (the good faith execution of a search warrant is a ministerial act, and not entitled to the discretionary exception).

Applying these principles to our facts, we find no evidence that either Murphy or Wilson violated any statutory duties by issuing housing-choice vouchers to the tenants of Town Creek. Although trial testimony elicited many instances of Murphy's (or Wilson's) violation of HUD regulations, these violations related only to the administration of the Mod Rehab program. Indeed, Urban Developers' expert on HUD regulations acknowledged that the federal

47

regulations were silent on the "issuing en masse of housing choice vouchers to everyone in a complex where some of the units have been damaged by natural disaster." Their expert also acknowledge that housing authorities may "adopt provisions in their administrative plans to help families affected by natural disasters."

In the absence of regulations to the contrary, Congress has vested public housing authorities with the "maximum amount of responsibility and flexibility in program administration." 42 U.S.C. § 1437. The MRHA board has furthermore vested the executive director with the discretion in an emergency to issue (or not issue) vouchers, a discretion that squarely implicates social, economic, and political policy considerations. Indeed, granting such immunity for exercise of discretion during a declared state of emergency is consistent with the aims of the MTCA, which works to "hinder fear that goes with risk-taking situations," and to encourage "timely decision-making without fear of liability." *Cargile*, 847 So.2d at 268.[18]

We find no conflict of substantial evidence on the question of

---

[18] Although not argued by the defendants on appeal, the MRHA and Murphy also likely would qualify for immunity under Miss. Code Ann. § 11-46-9(g), which grants immunity against any claim "[a]rising out of the exercise of discretion in . . . the provision of adequate governmental services," *id.*, and well as Miss. Code Ann. § 11-46-9(h), which grants immunity against any claim "[a]rising out of the issuance . . . of . . . any privilege, . . . unless such issuance . . . . is of a malicious or arbitrary and capricious nature . . . ." *Id.; see also* Jim Fraiser, *A Review of the Substantive Provision of the Mississippi Governmental Immunity Act*, 68 Miss. L.J. 703, 791–98 (1999).

whether Murphy's and Wilson's actions were discretionary. Their actions were exercises in judgment involving social policy and they and MRHA were therefore entitled to immunity from tort liability in respect thereto.

## CONCLUSION

For the foregoing reasons, the district court's denial of the MRHA, Wilson and Murphy's motion for judgment as a matter of law with respect to the breach of contract claim, the federal and state due process claims relating to Urban Developers' alleged property interest in the HAP and Annual Contribution contracts, the Mississippi law takings claim, and the negligence claim is REVERSED and REMANDED for entry of judgment in favor of those respective defendants. All other claims of Urban Developers on which it prevailed below, as against the City, MRHA, Wilson and Murphy, or any one or more of them, are DISMISSED without prejudice as unripe.

49