IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 23, 2009

Charles R. Fulbruge III
Clerk

No. 07-20409

CAROL SEVERANCE

Plaintiff-Appellant

v.

JERRY PATTERSON, Commissioner of the Texas General Land Office;
GREG ABBOTT, Attorney General for the State of Texas;
KURT SISTRUNK, District Attorney for the County of Galveston, Texas

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and WIENER and CLEMENT, Circuit Judges.

EDITH H. JONES, Chief Judge:

Carol Severance filed suit against Texas Attorney General Greg Abbott, Commissioner of the Texas General Land Office Jerry Patterson, and Galveston County District Attorney Kurt Sistrunk (the "Officials"), seeking declaratory and injunctive relief to prevent them from enforcing a public easement under the Texas Open Beaches Act, TEX. NAT. RES. CODE ANN. § 61.011(a) *et seq.* Severance contends that because the beach boundary of her property migrated landward after Hurricane Rita, taking in land not previously encumbered by a public access easement, the enforcement of the easement on her beachfront properties constitutes a seizure in violation of the Fourth Amendment and a

taking without just compensation in violation of the Fifth Amendment. The district court dismissed the action, ruling that Severance failed to state a claim for relief because Texas law recognizes a "rolling" beachfront easement; this type of easement predated Severance's purchase of her beachfront properties; the State may enforce the easement as natural changes occur in its location; and no constitutional violation results from an uncompensated change in the easement's location on Severance's property. We affirm dismissal of the takings claim and certify state law issues to the Texas Supreme court in regard to the claim of unreasonable seizure.[1]

## I.

To clarify the constitutional questions this case presents, a brief sketch of Texas's property law as it relates to the State's coastal areas is necessary. In *Luttes v. State*, the Texas Supreme Court ruled for the first time that the State owned only the coastal land seaward of the mean high tide, or the "wet beach." 324 S.W.2d 167, 187 (Tex. 1958). One year later, the Texas legislature enacted the Open Beaches Act ("OBA"), TEX. NAT. RES. CODE ANN. § 61.011(a). The OBA provides that

> if the public has acquired a right of use or easement to or over an area by prescription, dedication, or has retained a right by virtue of continuous right in the public, the public shall have the free and unrestricted right of ingress and egress to the larger area extending from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico [*i.e.* both the "wet beach" and "dry beach"].

*Id*.

To enforce the OBA, various state and local officials may seek declaratory or injunctive relief, including orders to remove "any improvement, maintenance,

---

[1] Notwithstanding the hyperbolic and unsupported assertions in Part I of the dissent ("Context"), the judges of the court endeavor <u>not</u> to decide appeals based on who the litigants are, who their lawyers are, or what we may believe their motives to be. Whether that rule is observed in light of Part I of the dissent, however, the reader must determine.

obstruction, barrier, or other encroachment on a public beach . . . ." *Id*. § 61.018(a). A landowner may not exclude the public from a beach covered by the OBA. *Id*. § 61.014(b).

Following passage of the OBA, Texas courts have found that the public has acquired easements by prescription or implied dedication or custom on the dry beach along portions of the Texas Gulf Coast. *See, e.g.*, *Seaway Co. v. Att'y Gen.*, 375 S.W.2d 923, 936-37 (Tex.Civ.App.—Houston 1964, writ ref'd n.r.e.); *Matcha v. Mattox,* 711 S.W.2d 95, 101 (Tex. Civ. App.—Austin 1986, writ denied); *Feinman v. State*, 717 S.W.2d 106, 113 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Although the OBA is silent about the effect of erosion on the boundaries of public beachfront easements, Texas courts have also held that, once an easement is established, its boundaries shift with the vegetation line and the line of mean low tide. *Feinman*, 717 S.W.2d at 110-11. Under this "rolling easement doctrine," the State is not required to establish a new easement via prescription, dedication or continuous right as the shoreline migrates landward. *Id*. Migration of the shoreline frequently accompanies hurricanes or tropical storms.[2]

## II.

Carol Severance, a California resident, purchased two beachfront properties along Bermuda Beach Drive and Kennedy Drive on West Galveston Island in April 2005. Each parcel was improved with a single-family home that Severance has used as rental properties. No easement has ever been established on either parcel via prescription, implied dedication, or continuous right.

---

[2] In 1985, the legislature amended the OBA to require disclosures to potential beachfront property owners of the presence of a public access easement over the public beach and the ensuing OBA consequences. Act 1985, 69th Leg., Ch. 350, § 1 eff. August 26, 1985. The Officials do not contend that the disclosures alone affected Severance's rights but only that they provided notice of the State's position under the OBA.

However, in 1975, the State obtained a judgment in another case that an easement existed on a strip of beach seaward of Severance's land.

The parties disagree as to whether any part of Severance's properties was subject to a rolling easement *before* Severance purchased the properties.[3] It is undisputed that after the purchase erosion caused by Hurricane Rita in September 2005 shifted the vegetation line farther landward, causing a large segment of Severance's properties, including both homes, to be located on the dry beach. On June 7, 2006, a temporary moratorium on the removal of houses located on the public beach expired, and the Commissioner informed Severance that her houses were subject to a removal order at any time. The State offered Severance approximately $40,000 assistance to relocate or remove the two houses. She refused the offer.

Severance promptly filed this suit for declaratory and injunctive relief against the Officials. She alleged that enforcement of the rolling easement pursuant to the OBA would effect an illegal seizure under the Fourth Amendment and an impermissible taking without just compensation under the Fifth Amendment. She also alleged that the enforcement would violate her substantive due process rights. The State moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that her constitutional challenges were barred on jurisdictional grounds, including sovereign immunity and ripeness, and were in any event meritless.

After determining that the Officials were not immune from suit, the district court drew a distinction between Severance's challenges to (a) the Officials' ability to bring a future action to have her homes removed under the

---

[3] The Officials assert that both of Severance's properties were on an official list, published in 1999, including over 100 homes that were "seaward of the vegetation line" and hence "on the public beach easement." Further, Severance received a notice when she purchased the properties warning that structures existing seaward of the vegetation line are subject to OBA removal lawsuits by the State of Texas.

OBA and (b) the imposition of the rolling easement in general, which prevents Severance from excluding others on the dry beach portion of her properties. The district court dismissed both challenges, finding the house removal claims not ripe and the rolling easement claims "arguably ripe" but deficient on the merits. As was noted at the outset, the district court held that Severance could not assert a claim for violation of state or constitutional law arising from the State's enforcement of a rolling public beachfront access easement on her properties.

Severance timely filed this appeal. She has abandoned her substantive due process challenge, and does not contest the dismissal of her house removal claims.[4] On appeal, she asserts that, as applied to her properties, the migration of the rolling easement without a finding of prescription, dedication or custom, and without compensation, effects an unconstitutional taking and seizure.

## III.

Before reaching Severance's arguments on the merits, we must consider the Officials' contention that her suit is barred on jurisdictional grounds. The Officials maintain that sovereign immunity precludes the suit, that Severance lacks standing to pursue her claims, and that her claims are unripe. We review the issue of Eleventh Amendment immunity, like other jurisdictional issues, *de novo*. *United States ex rel. Barron v. Deloitte & Touche*, 381 F.3d 438, 439 (5th Cir. 2004).

### A. Sovereign Immunity

The Officials contend that Eleventh Amendment sovereign immunity bars Severance's suit. The district court disagreed, holding that the suit fit within *Ex Parte Young*, which allows suits against state officials for prospective relief. *See* 209 U.S. 123, 28 S. Ct. 441 (1908).

---

[4] To the extent that Severance brought a generalized "facial" challenge in the district court, she has abandoned that challenge on appeal as well.

The Officials do not dispute that Severance is seeking prospective equitable relief. Rather, relying on the Supreme Court's decision in *Coeur d'Alene* and this court's decision in *Mauro*, they argue that the *Ex Parte Young* exception is inapplicable. *See Idaho v. Coeur d'Alene*, 521 U.S. 261, 117 S. Ct. 2028 (1997); *John G. & Marie Stella Kenedy Mem'l Found. v. Mauro*, 21 F.3d 667 (5th Cir. 1994). In *Coeur d'Alene*, the Supreme Court held that an Indian Tribe's suit was barred by the Eleventh Amendment because the Tribe's claims were the "functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the State to the Tribe" should the Tribe prevail. 521 U.S. at 282, 117 S. Ct. at 2040. The Court held that "[u]nder these particular and special circumstances," the *Ex Parte Young* exception to Eleventh Amendment sovereign immunity did not apply. *Id.* at 287, 117 S. Ct. at 2042-43. *Mauro* likewise arose from a quiet title action in which the parties disputed ownership of the property. 21 F.3d at 671-72.

In contrast to *Coeur d'Alene* and *Mauro*, Severance's suit is not the functional equivalent of a quiet-title action: Title to the properties at issue rests with Severance, not the State. The Officials do not claim title, nor could they under the OBA. *See* TEX. NAT. RES. CODE ANN. § 61.023 (OBA "shall not be construed as affecting in any way the title of the owners of land adjacent to any state-owned beach bordering on the seaward shore of the Gulf of Mexico"). The issue is whether the State may constitutionally impose an easement, or an encumbrance, on her fee simple estate. Thus, the "particular and special circumstances" of *Coeur d'Alene* and *Mauro* are not present in this case. *See Coeur d'Alene,* 521 U.S. at 287, 117 S. Ct. at 2042-43. *Ex Parte Young* applies, and Severance's suit is not barred by sovereign immunity.

## B. Standing

The Officials contend that Severance lacks standing because any taking or seizure took place before she acquired the properties at issue. The Officials

assert, and Severance disputes, that the easement attached to her properties no later than 1999, well before she bought them.

In the case of an alleged physical taking, like this one,[5] "any award goes to the owner at the time of the taking, and [ ] the right to compensation is not passed to a subsequent purchaser." *Palazzolo v. Rhode Island*, 533 U.S. 606, 628, 121 S. Ct. 2448, 2463 (2001). However, even if the easement had attached to some portion of Severance's properties before the purchase, the vegetation line shifted farther inland after the purchase. Because the State seeks to impose an easement on a different (and larger) segment of her properties than was covered at the time of her purchase, Severance has suffered an injury distinct from that of the previous owner.

In arguing otherwise, the Officials contend that a property owner suffers but a single injury at the time the easement initially rolls onto the property. Under this logic, if a state informs a property owner that it has imposed an easement on a particular parcel of land, and the owner then transfers the property to a new owner, the state could assert an easement on different and larger portions of the parcel without effecting a new constitutional injury. The Officials offer no support for this proposition. Indeed, a physical occupation of a property may constitute a taking despite an alleged preexisting easement of a smaller scope. *See, e.g.*, *Owen v. United States*, 851 F.2d 1404, 1415 (Fed. Cir. 1988). We, therefore, reject the Officials' argument that Severance lacks standing.

## C. Ripeness

The Officials contend that Severance's claims are premature. As explained, Severance brings two separate constitutional challenges: a Fifth

---

[5] The parties agree that if the imposition of the easement effectuates a taking, it is a physical taking. *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 832, 107 S. Ct. 3141, 3146 (1987); *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80, 100 S. Ct. 383, 393 (1979).

Amendment takings claim and a Fourth Amendment seizure claim. Because distinct ripeness inquiries apply to these claims, we address each in turn. Ripeness is a question of law, which we review *de novo*. *Urban Developers LLC v. City of Jackson*, 468 F.3d 281, 292 (5th Cir. 2006).

## 1. Ripeness of Takings Claims

The district court relied exclusively on the traditional case-and-controversy analysis in determining whether Severance's claims are ripe. The Supreme Court, however, has adopted a special, two-prong test for evaluating ripeness under the Takings Clause. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 194, 105 S. Ct. 3108, 3116, 3120-21 (1985). A takings claim is not ripe until (1) the relevant governmental unit has reached a final decision as to how the regulation will be applied to the landowner, and (2) the plaintiff has sought compensation for the alleged taking through whatever adequate procedures the state provides. *Id.* At issue here is only the second prong, the adequacy of the state procedures to compensate landowners for their property taken by the government.

The Officials contend that Severance's takings claims are not ripe under the state procedures prong because Severance failed to seek just compensation in state court. Severance counters with several arguments. She first asserts that *Williamson County*'s state procedures rule is inapplicable to her suit because this case involves a physical taking, whereas *Williamson County* involved a regulatory taking, and because she seeks injunctive rather than compensatory relief. Neither distinction renders *Williamson County* inapplicable.

Severance's argument that the state procedures rule does not apply to a physical takings claim is foreclosed in this circuit. In *Urban Developers LLC v. City of Jackson*, this court applied the *Williamson County* ripeness inquiry to an "ordinary," "non-regulatory" physical takings claim, and found the claim unripe

under the test's second prong. 468 F.3d at 294-95; *accord Peters v. Village of Clifton*, 498 F.3d 727, 733 (7th Cir. 2007) (applying *Williamson County*'s second prong to a physical takings claim); *Pascoag Reservoir & Dam, LLC v. Rhode Island*, 337 F.3d 87, 91 (1st Cir. 2003) (same); *Daniel v. County of Santa Barbara*, 288 F.3d 375, 382 (9th Cir. 2002) (same); *Arnett v. Myers*, 281 F.3d 552, 563 (6th Cir. 2002) (same).

Severance also contends that *Williamson County*'s state procedure rule is inapplicable because she seeks only injunctive and declaratory relief, whereas the claimant in *Williamson County* sought compensatory damages. Severance does not explain why this distinction should be of consequence, nor does she cite any authority to support her position. Several other circuits have held to the contrary by applying *Williamson County* to claims seeking injunctive or declaratory relief. *See Peters*, 498 F.3d at 730; *Von Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 379 (8th Cir. 1997); *Daniel*, 288 F.3d at 384-85; *Bickerstaff Clay Prods. Co. v. Harris County*, 89 F.3d 1481, 1490 (11th Cir. 1996). Moreover, in crafting the state procedures requirement in *Williamson County*, the Supreme Court relied on *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 n.21, 104 S. Ct. 2862, 2881 n.21 (1984), a case in which the plaintiff sought only injunctive and declaratory relief. We must reject her proffered distinction.

Severance next asserts that even if *Williamson County*'s state procedures requirement applies to all takings claims, the requirement is satisfied here. Under *Williamson County*, a property owner need not avail himself of state procedures before pursuing a takings claim in federal court if he can demonstrate that the state's procedures for seeking compensation are "unavailable or inadequate." 473 U.S. at 197, 105 S. Ct. at 3122.

Severance maintains that *Williamson County* should be construed only to require pursuit of *administrative* compensation procedures, not state-court litigation. Because neither the OBA nor any administrative rule prescribes an

administrative procedure for seeking compensation from the state, Severance contends that state procedures are unavailable and her claims are ripe. This argument is irreconcilable with *Williamson County* itself, which held a takings claim "premature" because the parties failed to use Tennessee's judicial inverse condemnation procedure. It is also at odds with multiple decisions of this court that found takings claims unripe when the claimant failed to seek compensation in state courts before filing a federal claim. *See, e.g.*, *Urban Developers*, 468 F.3d at 295; *Bryan v. City of Madison*, 213 F.3d 267, 276 n.16 (5th Cir. 2000).

Nonetheless, Severance asserts that requiring her first to litigate in state court would, through the principles of res judicata, claim and issue preclusion, effectively bar her from ever litigating her takings claim in federal court. We are not blind to this potential effect. *See San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 351, 125 S. Ct. 2491, 2509 (2005) (Rehnquist, C.J., concurring) (stating that the court should reconsider the state-litigation requirement, as "*Williamson County* all but guarantees that claimants will be unable to utilize the federal courts to enforce the Fifth Amendment's just compensation guarantee"). However, a majority of the Supreme Court in *San Remo* were unconcerned by this result, observing that "[i]t is hardly a radical notion to recognize that, as a practical matter, a significant number of plaintiffs will necessarily litigate their federal takings claims in state courts." *Id.* at 346, 125 S. Ct. at 2506. The Court explained that "[s]tate courts are fully competent to adjudicate constitutional challenges to local land-use decisions," and "[i]ndeed, state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions" implicated by property regulation. *Id.* at 347, 125 S. Ct. at 2507. Thus, unless the Supreme Court overrules the state procedures requirement, we are bound to give effect to it.

Severance next argues that Texas's procedures are inadequate because state courts would undoubtedly deny compensation if she were to seek it. The Officials counter that the inadequacy exception to the state procedures rule applies only when a state court claim does not exist at all, *i.e.*, there is no state court vehicle for asserting the relevant claim, not when the plaintiff believes an available procedure will be unsuccessful. Some circuits subscribe to the state's construction,[6] but this court has adopted a less restrictive definition of "inadequate." In *Samaad v. City of Dallas*, we found merit in *Williamson County*'s "implicit conclusion that the mere existence of some compensation mechanism does not necessarily render those procedures adequate." 940 F.2d 925, 934 (5th Cir. 1991). Rather, "inadequate procedures are those that *almost certainly* will not justly compensate the claimant." *Id.* (internal quotation marks omitted). Our cases have therefore examined state law to determine whether available courts "unquestionably would afford [the plaintiff] no remedy." *Id.* at 935; *see also Rolf v. City of San Antonio*, 77 F.3d 823, 827 (5th Cir. 1996).[7]

Turning to that inquiry, Severance, who bears the burden of proof, asserts that Texas courts have uniformly held that no taking results when state officials conclude that an OBA beach access easement has rolled over private property. But the Texas Supreme Court has not yet addressed whether imposition of the

---

[6] *See Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404, 408 (4th Cir. 2007); *Rockstead v. City of Crystal Lake*, 486 F.3d 963, 965-66 (7th Cir. 2007); *SGB Fin. Servs., Inc. v. Consol. City of Indianapolis-Marion County*, 235 F.3d 1036, 1039 (7th Cir. 2000).

[7] Other courts have indicated that state procedures, though "available," may be inadequate if the plaintiff is certain to lose in state court. *See Littlefield v. City of Afton*, 785 F.2d 596, 609 (8th Cir. 1986) (overruled on other grounds) ("Until the Minnesota courts have ruled that an inverse condemnation action may not be brought *or denies damages in such an action*, appellants' claim of taking without just compensation is not ripe for decision by a federal court." (emphasis added)); *Schnuck v. City of Santa Monica*, 935 F.2d 171, 174 (9th Cir. 1991) (examining whether state courts had made clear that they would reject any taking claim based on the rent control law the plaintiff challenged).

rolling easement is consistent with state law or whether compensation must be awarded when the easement moves onto previously unencumbered property. Indeed, the state Supreme Court appears to have avoided ruling on these issues whose resolution is vital to the rights of thousands of Texas beachfront property owners.

While three intermediate appellate courts have upheld the imposition of a rolling easement and concluded that it does not effect a taking, the decisions offered little to no analysis of the takings issue. *See Arrington v. Mattox*, 767 S.W.2d 957, 958-59 (Tex. App.—Austin 1989); *Matcha v. Mattox*, 711 S.W.2d 95, 101 (Tex. App.—Austin 1986); *Moody v. White*, 593 S.W.2d 372, 379-80 (Tex. Civ. App.—Corpus Christi 1979).[8] In addition, two assumptions on which these courts found no taking are open to debate. One assumption of these courts is that the "rolling easement doctrine" inheres in longstanding principles of Texas common law and is not a construction of the OBA. *See Arrington*, 767 S.W.2d at 958; *Matcha*, 711 S.W. 2d at 101. In the seminal case establishing that easements shift as the natural shoreline shifts, the court stated that "[c]ourts

---

[8] *Moody* held, incorrectly, that the takings issue raised by the landowners was "resolved" in *Seaway*, 375 S.W. 2d 923 (Tex. Civ. App.—Houston 1964, writ ref'd n.r.e.) evidently because the Texas Supreme Court denied review "n.r.e.," *i.e.*, "no reversible error." The "n.r.e." designation, however, bespoke no comment on the merits by the state supreme court at that time. *Commercial Standard Ins. Co. v. Marin*, 488 S.W.2d 861, 864 (Tex. Civ. App. —San Antonio 1972, writ ref'd n.r.e.) (cited with approval in *Ulico Cas. Co. v. Allied Pilots Ass'n.*, 262 S.W.3d 773, 781 n.3 (Tex. 2008)). *Matcha*, alone among Texas courts, adopted the common law doctrine of "custom" to support public beach access and a rolling easement, and then declared conclusionally that its novel doctrine eliminated any takings issue. *Arrington* relied on *Matcha*, but also erroneously cited *Feinman* (in which the takings issue was waived), and *Seaway* (which did not involve a rolling easement and is otherwise distinguishable). These decisions furnish no compelling explanation why, when a rolling easement claims land that was behind the vegetation line before a storm and therefore subject to the landowners' right to exclude the public, the shifted boundary has not been "taken" and the government is not required to pay just compensation. Indubitably, no "fixed" background principles of state law are articulated, only mutually inconsistent post hoc rationales. The state Supreme Court must sort out the confusion. *See generally* Neal E. Pirkle, Note, *Maintaining Public Access to Texas Coastal Beaches: The Past and The Future*, 46 BAYLOR L. REV. 1093 (1994).

have upheld the concept of a rolling easement along rivers and the sea for many years," suggesting it was deciding whether the rolling easement was a product of common law. *Feinman*, 717 S.W.2d at 110-11. *Feinman*, however, ultimately characterized the rolling easement as "implicit in the Act." *Id.* at 111. Whether the public's beach access easement arises by virtue of common law and under what theory — prescription, implied dedication, custom or the OBA itself — is a critical component of takings analysis, yet the state courts' decisions are utterly inconsistent.[9]

The second arguable assumption is that the rolling easement may obliterate the landowner's improvements, *e.g.*, by requiring removal of entire houses that when built were on the landward side of the vegetation line. The *Seaway* case, which first carefully construed the OBA's reach in regard to Galveston's West Beach, held only that a public easement had existed over the dry beach by implied dedication or prescription. In so holding, the court noted more than once that the beach's tide and vegetation boundaries had remained essentially stable for two hundred years or more, the stability interrupted only by occasional, temporary changes caused by storms. *Seaway*, 375 S.W.2d at 931. *See also Moody*, 593 S.W.2d at 379 (citing *Seaway* to support the proposition that "there is considerable testimony in the record which establishes the stability of the beach in question"). *Seaway*, in fact, declined to consider the constitutionality of the OBA precisely because the state's easement in that case

---

[9] Because of certain systemic flaws, it is hard to respond to the dissent, which asserts that Texas law is utterly clear. For instance, the dissent does not deign to interpret the OBA's language; to respond to this opinion's analysis of lower Texas cases; to note the law review articles that have discussed the OBA; or to engage in a historical survey of Texas land title law to support its position. *See, e.g.*, *Luttes v. State*, 324 S.W.2d 167 (Tex. 1958) (analyzing ownership of Texas beach land based on Spanish land grants). Moreover, it is not even clear that the dissent has read the majority opinion, which does not "declare that with each shift of the vegetation line, a new easement is born." That is an issue the Texas Supreme Court must address. Nor does this opinion hold that Severance's claim "will ripen in the future." That depends on what Texas courts do in this or other cases.

was proved with findings, *inter alia*, that a "beach" "had remained in substantially the same geographical position since the time of the Jones [and] Hall grant"; that the "mean high water line has not advanced landward since July 31, 1931"; that "since November 28, 1840[,] there has been no landward advance of the mean high tide in the area used as a public way"; and "[t]here has been no net erosion along the shore of the Gulf of Mexico." *Seaway*, 375 S.W.2d at 927.

Given the uncertainty and ambiguity of Texas law concerning rolling easements and the takings consequences thereof, the Texas Supreme Court might award relief under the facts Severance has alleged. *See Rolf*, 77 F.3d 823, 827 (dismissing a takings claim as unripe where the Texas Supreme Court had not yet addressed the plaintiff's exact claim). Because we cannot say with certainty that Severance would be denied compensation if she were to bring her claims in state court, her takings claim is premature in this court.[10]

## 2. Ripeness of Seizure Claim

Unlike her takings claim, Severance's Fourth Amendment seizure claim, which is not governed by the *Williamson County* framework, is ripe. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149-55, 87 S. Ct. 1507, 1515-18 (1967) (outlining as relevant factors (1) whether the issues are purely legal; (2) whether the issues are based on final agency action; (3) whether the controversy has a

---

[10] It is possible, as the dissent assumes, that the easement, once it attaches to private property, automatically creates or destroys a right of public access as the vegetation line shifts landward or seaward, respectively. It is also possible that the language of the Open Beaches Act means no more than what it says: The public only obtains a right to ingress and egress on land between the mean low tide and the vegetation line "if the public has acquired a right of use or easement to or over an area by prescription, dedication, or has retained a right by virtue of continuous right in the public." TEX. NAT. RES. CODE § 61.011(a). Absent prescription, dedication or continuous right, the public does not automatically have a "right of ingress and egress to the larger area extending from the mean low tide to the line of vegetation." *Id.* The dissent's insistence that this potential scheme is cumbersome does not change the statute's meaning, nor does it clarify the ambiguity in Texas caselaw.

direct and immediate impact on the plaintiff; and (4) whether the litigation will expedite, rather than delay or impede, effective enforcement by the agency).

The Officials do not contest that these factors all support finding Severance's seizure claim ripe. The issues are purely legal. The district court determined that Severance's claims turn on whether the rolling easement doctrine is an aspect of Texas common law or a creature of the OBA. Further factual development is unnecessary. Second, the Officials have adopted the final agency position that the landward movement of the vegetation line onto Severance's property burdens that property with a public access easement, without proof of the elements of common law prescription, dedication, or customary right on the new area and without any provision of just compensation. Third, the controversy has a direct and immediate impact on Severance. The Officials' enforcement of a public easement prevents her from lawfully excluding the public from her land, TEX. NAT. RES. CODE ANN. § 61.014(b), and subjects her to stiff financial penalties if she violates these restrictions, TEX. NAT. RES. CODE ANN. § 61.018(c). Fourth, resolving the issue now would facilitate OBA enforcement and eliminate uncertainty as to the constitutionality of the rolling easement doctrine for numerous Texas landowners. Accordingly, the district court erred in holding that this claim is merely "arguably ripe."

## IV.

Because we reject the Officials' justiciability attacks on Severance's seizure claim, we must consider whether the district court properly dismissed this claim under Rule 12(b)(6). The grant of a motion to dismiss under Rule 12(b)(6) is reviewed *de novo*. *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004). We construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *See Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). To

survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, *Ker v. California*, 374 U.S. 23, 30, 83 S. Ct. 1623, 1628 (1963), provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, (1984); *Soldal v. Cook County*, 506 U.S. 56, 61, 113 S. Ct. 538, 543 (1992).

The Officials preliminarily contend that any Fourth Amendment claim here is fully subsumed by Severance's takings claim and is therefore not separately cognizable. We reject this contention. The Fourth Amendment applies to civil as well as criminal seizures, *Freeman v. City of Dallas*, 242 F.3d 642, 647 n.5 (5th Cir. 2001) (en banc), and the Supreme Court holds that an interference with individual property rights may be found to breach more than one provision of the Constitution. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 49-50, 114 S. Ct. 492, 499 (1993). The Court has not specifically ruled that separate claims for constitutionally unreasonable seizure and taking of property may coexist, but the Fourth Circuit has so held. *Presley v. City of Charlottesville*, 464 F.3d 480, 487 (4th Cir. 2006). Further, this court has ruled more than once that substantive due process, procedural due process, equal protection and takings claims may be implicated simultaneously in various types of governmental actions that interfere with individual property rights. *Simi Inv. Co.. v. Harris County*, 236 F.3d 240, 248-49 (5th Cir. 2000); *John Corp. v. City of Houston*, 214 F.3d 573, 584-85 (5th Cir. 2000). This court cautioned that substantive due process is not the "appropriate avenue of relief" for most

16

landowner complaints, and that, with rare exceptions, takings clause "jurisprudence cannot be circumvented by artful pleading of substantive due process claims." *Simi Inv. Co. v. Harris County*, 256 F.3d 323 (5th Cir. 2001) (per curiam), *denying reh'g to* 236 F.3d 240 (5th Cir. 2000). The reason for such expressed caution must be that a specific constitutional protection ought generally to control over claims made under the rubric of substantive due process. The Fourth and Fifth Amendments, however, both provide specific constitutional commands. That they may have evolved through caselaw to overlap in providing remedies for some deprivations of property interests does not authorize this court to fail to apply one or the other provision. Indeed, as *Presley* noted, the elements of a violation of the two amendments differ, with the touchstone of a takings claim being lack of just compensation and that of a seizure claim being its unreasonableness. 464 F.3d at 485. Further, § 1983 authorizes different damage measures for the claims.

This is not to say that, as the Officials fear, "every ordinary taking of property for public use is to be hereafter actionable as a seizure." In the ordinary case, public authorities condemn private property according to fixed rules and regulations; the process that occurs and the compensation paid could hardly be challenged as "unreasonable." *See Freeman*, 242 F.3d at 654 (finding no unreasonable seizure where private property was properly condemned and demolished under local police power). Nor would many regulatory takings implicate the Fourth Amendment, for, as *Presley* notes, they may not involve sufficient interference with possessory interests to constitute a seizure. 464 F.3d at 485 (citing *Lucas v. S.C. Coastal Comm.*, 505 U.S. 1003, 1014, 112 S. Ct. 2886, 2892-93 (1992)).

Here, however, Severance sufficiently asserts the elements of a Fourth Amendment claim, *i.e.*, (a) a meaningful interference with her possessory interests in her property, which is (b) unreasonable because the interference is

17

unjustified by state law or, if justified, then uncompensated. *See Presley*, 464 F.3d at 487-88. The State asserts the appropriation of an easement over beachfront land not previously so encumbered, and the consequence of the easement, according to the State, is that Severance may neither repair her damaged houses nor rebuild on that segment of her property nor exclude the public from using the new dry beach even though they were previously excluded. Not only has the State thus appropriated an easement over her property, but it denies owing any compensation. These facts state a potential claim under the Fourth as well as Fifth Amendments.

Unfortunately, for reasons noted above, a clearcut resolution of the respective property rights of Severance and the State is impossible. Texas caselaw fails to afford a consistent rationale for the creation or sustaining of a rolling beachfront easement. Various authorities cited by lower Texas courts in support of a common law "background principle" involve accretion and avulsion occurring at the boundaries of real property and do not address whether an easement's boundaries may change automatically with changes to the shoreline.[11] Moreover, there are obvious conceptual difficulties in concluding that an easement is established by implied dedication or prescription, for example, over areas on which the public has never set foot. Consequently, it is conceivable that a definitive state court ruling could result in any of several possibilities. The Texas Supreme Court might conclude that (a) no rolling easement is recognized by Texas law; (b) a rolling easement cannot be allowed to displace structures that a landowner placed on the property before the boundary shifted; (c) any significant shift in the rolling easement's boundary due

---

[11] *See, e.g.*, *Feinman*, 717 S.W.2d at 110 (citing *Barney v. City of Keokuk*, 94 U.S. 324, 339-340(1876); *Luttes v. State*, 324 S.W.2d 167 (Tex. 1958); *County of Hawaii v. Sotomura*, 517 P.2d 57, 61 (Hawaii 1973); *Horgan v. Town Council*, 80 A. 271 (R.I. 1911); *City of Chicago v. Ward*, 48 N.E. 927 (Ill. 1897); *Godfrey v. City of Alton*, 12 Ill. 29, 36 (1850)).

to a natural shoreline movement must be accompanied by compensation of the landowner; or (d) Texas recognizes a rolling easement and its enforcement as provided in the OBA, but no landowner compensation is required.[12]  Whether a "reasonable" seizure has been accomplished by the Officials here depends on a definitive construction of Texas law as to which there is no state Supreme Court precedent, much less controlling precedent.  Consequently, the prudent course is for this court to certify to the Texas Supreme Court the important and determinative, but unresolved, questions of Texas law that underlie resolution of the seizure claim in this case.[13]

> CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS, PURSUANT TO ARTICLE 5, SECTION 3-C OF THE TEXAS CONSTITUTION AND RULE 58 OF THE TEXAS RULES OF APPELLATE PROCEDURE.  TO THE SUPREME COURT OF TEXAS AND THE HONORABLE JUSTICES THEREOF:

> ## STYLE OF THE CASE

> The style of the case in which certification is made is *Severance v. Patterson*, No. 07-20409, in the United States Court of Appeals for the Fifth Circuit, on appeal from the United States District Court for the Southern District of Texas.  Federal jurisdiction is based on violation of federal constitutional rights.

---

[12] In *Coastal Indust. Water Auth. v. York*, 532 S.W.2d 949 (Tex. 1976), the Supreme Court's analysis of questions involving subsidence and submergence of property along a non-tidally-influenced part of the Houston Ship Channel cited with apparent approval cases holding that title does not pass by avulsion, *i.e.*, sudden deposits or removals of land along a water boundary.  *Id.* at 952.  Nor is there a different rule depending on whether artificial or natural causes produced the change.  *Id.*  *See generally* Dinkins, *Texas Seashore Boundary Law: The Effect of Natural and Artificial Modifications*, 10 Hous. L. Rev. 43 (1972).  *York* furnishes hints but no real guidance on the issues before us.

[13] The dissent's discussion of reasonableness is premature.  The reasonableness of the interference with Severance's possessory interest must be analyzed in light of Texas law, as the state courts ultimately construe it.  While accusing the majority of rushing to allow the Fourth Amendment claim to proceed, the dissent rushes to judgment on the merits, without waiting for clarification of the relevant law.

The Fifth Circuit, on its own motion, has decided to certify these questions to the Justices of the Supreme Court of Texas.

## STATEMENT OF CASE

The preceding discussion in this opinion articulates the facts relevant to the questions certified.

## LEGAL ISSUES

The preceding discussion of Texas authorities and the Texas Open Beaches Act, TEX. NAT. RES. CODE ANN. § 61.011(a) *et seq*, ("OBA"), explains that there is no controlling Texas Supreme Court authority for the certified questions and no consistent rationale for lower courts' decisions on these questions.

## QUESTIONS CERTIFIED

We certify the following questions, which are essential to determining the constitutional reasonableness of the seizure of a rolling easement over portions of Severance's beachfront properties, to the Supreme Court of Texas:

1. Does Texas recognize a "rolling" public beachfront access easement, *i.e.*, an easement in favor of the public that allows access to and use of the beaches on the Gulf of Mexico, the boundary of which easement migrates solely according to naturally caused changes in the location of the vegetation line, without proof of prescription, dedication or customary rights in the property so occupied?

2. If Texas recognizes such an easement, is it derived from common law doctrines or from a construction of the OBA?

3. To what extent, if any, would a landowner be entitled to receive compensation (other than the amount already offered for removal of the houses) under Texas's law or Constitution for the limitations on use of her property effected by the landward migration

20

of a rolling easement onto property on which no public easement has been found by dedication, prescription, or custom?

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the questions certified.

## V.

For the foregoing reasons, we conclude that Severance's takings claim is premature and was properly dismissed by the district court, but the propriety of the dismissal of her seizure claim depends on the state law basis for the seizure, implicating issues that we must certify to the Texas Supreme Court.

AFFIRMED IN PART, QUESTIONS CERTIFIED IN PART.

WIENER, Circuit Judge, dissenting:

With genuine regard and respect for my colleagues of the panel majority, I must dissent.

## I. CONTEXT

Although undoubtedly unintentionally, the panel majority today aids and abets the quixotic adventure of a California resident who is here represented by counsel furnished *gratis* by the Pacific Legal Foundation. (That non-profit's published mission statement declares that its raison d'être includes "defend[ing] the fundamental human right of private property," noting that such defense is part of each generation's obligation to guard "against government encroachment.") The real *alignment* between Severance and the Pacific Legal Foundation is not discernable from the record on appeal, but the real *object* of these Californians' Cervantian tilting at Texas's Open Beaches Act ("OBA") is clearly not to obtain reasonable compensation for a taking of properties either actually or nominally purchased by Severance, but is to eviscerate the OBA, precisely the kind of legislation that, by its own declaration, the Foundation targets. And it matters not whether Ms. Severance's role in this litigation is genuinely that of the fair Dulcinea whose distress the Foundation *cum* knight errant would alleviate or, instead, is truly that of squire Sancho Panza assisting the Foundation *cum* Don Quixote to achieve its goal: Either way, the panel majority's reversal of the district court (whose rulings against Severance I would affirm) has the unintentional effect of enlisting the federal courts and, via certification, the Supreme Court of Texas, as unwitting foot-soldiers in this thinly veiled Libertarian crusade. It is within this framework that I shall seek to demonstrate how the panel majority misses the mark and why Severance's action should be dismissed, once and for all, for her lack of standing to assert either a Fifth Amendment takings claim for reasonable compensation (because

Severance has had nothing *taken* by the State) or a Fourth Amendment unreasonable seizure claim (because that which was putatively seized did not belong to Severance at the time; and even if it had, there was nothing unreasonable about the purported seizure).[1]

## II. OVERVIEW

The panel majority unnecessarily approbates a new avenue of attack against the State's power of eminent domain; for not only is the analysis in today's majority opinion fundamentally flawed, but the panel majority needlessly takes on a question of constitutional significance despite the availability of prudential grounds on which to decide this appeal. At bottom, there is but one easement, albeit one whose boundaries could shift and have shifted. Thus, if there ever was a taking, there was but one — and it occurred long before Severance acquired title to the properties. Refusing to accept this truism, the majority opinion proceeds to misinterpret both the Texas statute at issue and Texas case law. As a result, it incorrectly holds that Severance has standing to assert her takings claim, when and if it should ever ripen, as well as her putative seizure claim. Compounding that error, the majority blurs the boundaries and conflates the elements of a Fourth Amendment seizure claim and those of a Fifth Amendment takings claim, then ignores our precedent and prolongs this meritless litigation by unnecessarily certifying questions to the Texas Supreme Court. I can concur in neither the reasoning of the majority opinion nor its outcome, which permits Severance to seek a benefit based on prior state action to which she has not only acceded and thereby forfeited or

---

[1] The district court dismissed Severance's action pursuant to FED. R. CIV. P. 12(b)(6). In my opinion, Severance has no standing to bring her claims whether ripe or not. Nevertheless, were she to be found to have standing, I would affirm the substantive decision of the district court, because she has indeed failed to state any claim on which relief can be granted.

waived any related claim, but for which she has presumably been remunerated through an intrinsic diminution in the purchase price that she paid when she bought the already burdened beachfront land.

## III. FIFTH AMENDMENT TAKINGS CLAIM

In the half century since the Texas Legislature enacted the OBA in 1959, the State has recognized the public's ability to acquire — through prescription, dedication or retained right — an easement over portions of the dry beach, whether or not privately owned, along the Texas Gulf Coast. And, it is undisputed that the public acquired such an easement over the beach on which sit properties subsequently acquired by Severance. The OBA states in relevant part:

> (a) It is declared and affirmed to be the public policy of this state that the public, individually and collectively, shall have the free and unrestricted right of ingress and egress to and from the state-owned beaches bordering on the seaward shore of the Gulf of Mexico, or if the public has acquired a right of use or easement to or over an area by prescription, dedication, or has retained a right by virtue of continuous right in the public, the public shall have the free and unrestricted right of ingress and egress to the larger area extending from the line of mean low tide *to the line of vegetation* bordering on the Gulf of Mexico.[2]

The language makes clear (and any doubt that might have lingered has been removed by later legislation and the consistent holdings of the Texas intermediate appellate courts) that the landward border of this easement is not and cannot be permanently fixed.[3] That boundary is identified as the "line of

---

[2] TEX. NAT. RES. CODE § 61.011(a) (Vernon 2009) (emphasis added).

[3] This is not a novel concept. Courts have long recognized that boundaries of property abutting waterways may shift with the movement of the water. *See, e.g., Louisiana v.*

vegetation," which, given the vagaries of nature, will always be in a state of intermittent flux.

The practical and legal effect of this shifting boundary is that there is and remains only a single easement of public access to the beach. Shifts in the vegetation line do not create new easements; rather they expand (or, in the case of seaward shifts, reduce) the size and reach of that one dynamic easement. To construe the vegetation line as ever having been a fixed point ignores (1) the plainest interpretation of the unambiguous statutory language, (2) later legislation that reasserts this principle,[4] (3) the ease with which the Texas Legislature could have, had it wanted to, fixed the easement's boundary permanently by specifying a fixed date at which to set the line, (4) interpretations of the Texas courts,[5] and (5) our own prior acknowledgment of

_____

*Mississippi*, 516 U.S. 22, 25, 116 S. Ct. 290 (1995) (referring to the rule of "thalweg," which holds that a river boundary between states lies along the main downstream navigation channel and "moves as the channel changes with the gradual processes of erosion and accretion"); *Georgia v. South Carolina*, 497 U.S. 376, 403-04, 110 S. Ct. 2903 (1990) ("When the bed is changed by the natural and gradual processes known as erosion and accretion, the boundary follows the varying course of the stream."); *Nebraska v. Iowa*, 143 U.S. 359, 360, 12 S. Ct. 396 (1892) ("It is settled law that when grants of land border on running water, and the banks are changed by that [gradual] process known as 'accretion,' the riparian owner's boundary line still remains the stream, although, during the years, by this accretion, the actual area of his possessions may vary"; contrasting "accretion" with "avulsion," which holds that the boundary does not shift if the water channel shifts course suddenly.). That the line contemplated in the Texas OBA should likewise shift, albeit based on nature's relocation of the vegetation line rather than a shifting watercourse, is a difference without distinction.

[4] Act of May 24, 1985, 69th Leg., R.S., ch. 350, § 1, 1985 Tex. Gen. Laws 1419 (codified as TEX. NAT. RES. CODE § 61.025 (Vernon 2009)).

[5] *See*, *e.g.*, *Arrington v. Mattox*, 767 S.W.2d 957 (Tex. App.—Austin 1989, writ denied) ("public right of use or easement migrates and moves landward or seaward with the natural movements of the natural line of vegetation and the line of mean low tide"); *Feinman v. State*, 717 S.W.2d 106, 111 (Tex. App.—Houston[1st Dist.] 1986, writ ref'd n.r.e.) ("we concluded that the vegetation line is not stationary and that a rolling easement is implicit in the Act"); *Matcha v. Mattox*, 711 S.W.2d 95, 99 (Tex. App.—Austin 1986, writ ref'd n.r.e.) ("Although these boundaries do tend to shift occasionally, they can be determined at any given point in

this phenomenon.[6] Despite all of this, the majority declares that with each shift of the vegetation line, a new easement is born. I cannot agree. There is and always has been one and only one easement; and that easement already encumbered the entirety of Severance's land at the time she bought it, even though the easement's maximum effect and coverage remained inchoate while the vegetation line lay seaward of her property.[7]

Severance has conceded that the easement was established over the dry beach on which her property sits prior to her purchase. But even if she had not, that fact is beyond debate: (1) The property was identified for condemnation as early as 1999 because it had encroached on the dry beach some six years before her purchase, (2) she had to sign a statement when she took title to the land acknowledging the easement and its full potential effect,[8] and (3) at least one Texas court had found there to be an easement across that exact stretch of beach

---

time. The rule has been established that easements may shift from time to time."); *Moody v. White*, 593 S.W.2d 372, 379 (Tex. Civ. App.—Corpus Christi 1979, no writ) (same); *cf. Seaway Co. v. Attorney General*, 375 S.W.2d 923, 939 (Tex. Civ. App.—Houston 1964, writ ref'd n.r.e.) (evidence demonstrates vegetation line has been stable for 200 years and can be easily determined).

[6] We have twice stated this rule. In *Mikeska v. City of Galveston*, we said, with reference to the OBA, "[d]ue to shifts of the vegetation line and the erosion of the shoreline, the natural demarcation lines are not static . . . the legal boundaries of the public easement change with their physical counterparts." 451 F.3d 376, 378 (5th Cir. 2006) (citing *Feinman*, 717 S.W.2d at 110-11). And, in *Hirtz v. State*, we stated that because of the OBA's definition of the landward boundary of a beach easement as "the line of vegetation" "the location of the easement shifts as the vegetation line shifts." 974 F.2d 663, 664 (5th Cir. 1992).

[7] Severance appeals only the disposition of her claims as to the effect of the easement itself on her land *qua* land. She does not appeal the rulings on her claims as to the condemnation of the improvements on the properties.

[8] Severance is a real estate broker licensed in Texas; she would have difficulty claiming that she did not know the import of what she was signing.

26

pursuant to the OBA.[9] Severance cannot dispute that when she bought the land, she did not acquire any right to exclude the public from any portion that is dry beach. Although she could exclude the public from those parts of her properties that at any given time lay landward of the vegetation line, she could do so only until that line shifted further inland.[10]

I agree with the majority that the property right at issue here is the "right to exclude" members of the public from the dry beach portion of Severance's land. *But Severance never owned this right*,[11] so she obviously cannot now claim that what she never owned has been taken from her. The State had taken this "stick" from the bundle of rights comprising ownership of the land long before Severance ever acquired title to the properties.[12] Severance's legal right to exclude the public from her land pertained only *until* the vegetation line shifted landward; the Hurricane Rita-related shift merely gave a new footprint to a taking that had occurred long before her ownership commenced.[13]

---

[9] *Feinman*, 717 S.W.2d at 112-13.

[10] Likewise, the public retains only the right of access until the vegetation line might again roll seaward and off of Severance's property.

[11] *See, e.g.*, *Daniel v. County of Santa Barbara*, 288 F.3d 375, 383 (9th Cir. 2002) ("Under established federal law, a taking occurs when an option to take an easement is granted, not when the option is exercised.").

[12] *See, e.g.*, *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S. Ct. 383 (1979) (a landowner's right to exclude others from his land is "one of the most essential sticks in the bundle of rights that are commonly characterized as property."). Severance retains title to and dominion over her property.

[13] *See, e.g.*, *Palazzolo v. Rhode Island*, 533 U.S. 606, 628, 121 S. Ct. 2448 (2001). In *Palazzolo*, the Supreme Court stated that notice at the time of acquisition does not alone strip a property owner of the ability to contest an easement's effect on his property rights. 533 U.S. at 627-28. But the easement across Severance's property is distinct from the land-use

27

The majority's approach perceives the birth of a brand new easement every time the vegetation line shifts,[14] a result I view as a legal impossibility. The line of vegetation, even though relatively stable perhaps, is always subject to flux, as nature is wont to be.[15] Furthermore, the vegetation line can move either landward or seaward from time to time. The majority's analysis, which sees the possibility of infinite mini-takings implicit in the statutory language, appears to assume that the vegetation line moves only landward, for it fails to account for how a property owner may reclaim his land as a result of a seaward shift.[16] Rather than interpreting the plainly worded statute at face value, the majority opts for a more convoluted reading, one that, if accurate, would mire the State in the absurdity of endless litigation over an infinite number of infinitesimal accretions to the dry beach.

___

restriction in *Palazzolo*. In that case the effect, if any, of the land-use restriction on the property owner's rights could not be known until the property owner attempted to develop his land and the governing board, in that case, denied his application. *Id*. at 614-15, 618-19, 627-28. In the instant case, the effect of the easement encumbering Severance's property is and always has been clear: She cannot exclude the public from the dry beach portion of her land, an area that shifts over time. She knew the possessory effect of the easement at the time she purchased the properties.

[14] The majority would bolster its approach by seeing confusion in the Texas case law. But it is the majority that appears to confuse the question of the effect of the easement's "rolling" boundary with the question of how many easements are at work: Texas courts might disagree about the former, but not about the latter.

[15] Indeed, this court has considered claims similar to Severance's after previous major storms caused dramatic shifts in the vegetation line along the Texas Gulf Coast. *Mikeska v. City of Galveston*, 451 F.3d 376, 378 (5th Cir. 2006) (Tropical Storm Frances in 1998); *Hirtz v. State*, 974 F.2d 663, 664 (5th Cir. 1992) ( Hurricane Alicia in 1983 and "fierce spring storms" in 1988).

[16] The panel majority ignores the obvious implication of its holding: If the State must pay for a new taking with each landward shift, surely the property owner must pay reasonable compensation to the State to buy back his right to exclude the public with each seaward shift.

28

Had the Texas Legislature intended such a result, it easily could have fixed the extreme of the landward boundary of the easement. Instead, the State borrowed from the familiar common law approach to property lines expected to fluctuate over time. Were there any remaining doubt as to the result originally intended by the Legislature, the lawmakers put it to rest in 1985 when they passed legislation (the "1985 Act") mandating that sellers of beachfront property inform buyers of the OBA's easement.[17] The 1985 Act states: "Structures erected seaward of the vegetation line (or other applicable easement boundary) *or that become seaward of the vegetation line as a result of natural processes* are subject to a lawsuit by the state of Texas to remove the structures."[18] The 1985 Act makes pellucid that once an easement on the dry beach is established, its landward boundary may therefore "roll," *including over private property*.

A correct determination whether there was one easement or many is the key to the standing analysis in this case. Under the *Palazzolo v. Rhode Island* physical-taking analysis — which the majority purports to employ — Severance lacks standing to bring a Fifth Amendment claim because any taking occurred prior to her 2005 purchase of the property.[19] The majority nevertheless reasons that the rule of *Palazzolo* does not deprive Severance of standing because, when

---

[17] Act of May 24, 1985, 69th Leg., R.S., ch. 350, § 1, 1985 Tex. Gen. Laws 1419 (codified as TEX. NAT. RES. CODE § 61.025 (Vernon 2009)).

[18] *Id.* (all capital letters-emphasis removed; emphasis added).

[19] 533 U.S. 606, 628, 121 S. Ct. 2448 (2001) (injury occurs at the time the taking is effected). At any rate, Severance did not pay for the property interest, the taking of which would have been reflected in an intrinsic discount on the purchase price, which she, as a willing buyer, paid her willing seller, both being fully informed of the OBA by virtue of the 1985 Act. *See infra* note 21. She took a calculated risk when she bought the property, paying less in the knowledge that her legal right to exclude the public from the land was limited.

she bought the land, the easement had not attached to the portion of the land that was later affected by Hurricane Rita. As explained above, this simply is not so: Severance's entire property was encumbered by the easement's very real potentiality — and predictability — that the vegetation line would shift.[20] Simply put, a pre-existing restriction such as this cannot be a new taking.[21]

In sum, the majority's flawed multiple-easement analysis infectiously pervades its entire disposition of this case. Severance does not have standing to assert a claim for reasonable compensation under the Fifth Amendment because she has suffered no injury, any taking having occurred before she ever owned the land. The State asserts only a right that it had already acquired. Not only does the panel majority follow this primrose flaw to the erroneous conclusion that Severance has standing; it also relies thereon to conclude that even though Severance's claim is unripe now, it will ripen in the future, at which point she

---

[20] The litany of storms that have hammered and at times totally inundated Galveston Island, from "Isaac's Storm" in 1901 through Hurricane Ike in 2008, three years after Rita, leaves no doubt. *See*, *e.g.*, Erik Larson, *Isaac's Storm* (Random House 1999); *see also supra* note 15.

[21] *Lucas v. S. Car. Coastal Council*, 505 U.S. 1003, 1028-29, 112 S. Ct. 2886 (1992) (severe limitations on land use must "inhere in the title itself," addressing regulatory taking); *see also Daniel v. County of Santa Barbara*, 288 F.3d 375, 383 (9th Cir. 2002); *United States v. 30.54 Acres of Land*, 90 F.3d 790, 792 (3d Cir. 1996) (pre-existing limitation on landowner's title was not a taking when the government chose to exercise its right). Even if I could agree that a property owner might be able to contend that there is a new taking when he could not have known of an easement's potential effect on his land, Severance can make no such claim. Six years before she bought her properties, the State had condemned them for encroaching on the public beach easement.

Furthermore, Severance has been compensated for the missing "right to exclude" through an intrinsic diminution in her purchase price, and therefore has suffered no injury. *Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468, 476 (9th Cir. 1994) ("The price paid for the property presumably reflected the market value of the property minus the interests taken." ), *overruled on other grounds by WMX Tech., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc); *see also Daniel*, 288 F.3d at 383.

may return with a valid Fifth Amendment claim. But Severance's own personal takings claim never was ripe and can never be ripe because the only OBA takings claim related to the land she now owns ripened long before she bought it and was allowed to shrivel on the vine by the one who owned the property at the time the easement took effect on the land. By the time Severance purchased the properties, any takings claim had long since ceased to exist and thus could no longer be acquired by her or anyone else. It would be perverse to allow Severance back into court on her proffered takings claim, now or in the future.

## IV. FOURTH AMENDMENT SEIZURE

In permitting Severance's Fourth Amendment claim to proceed and then putting it on hold by certifying questions about it to the Texas Supreme Court, the majority violates one important aspect of the venerable principle of judicial restraint, *viz.*, deciding a case on constitutional grounds when the same result is available on non-constitutional grounds. Although in my view, the Fourth Amendment is wholly inapplicable to Severance's claim, we need not and should not reach this question of constitutional magnitude. It is elemental that we must neither "anticipate a question of constitutional law in advance of the necessity of deciding it; [nor] formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."[22] In opening the

---

[22] *Liverpool, N.Y. & P.S.S. Co. v. Emigration Com'rs*, 113 U.S. 33, 39, 5 S. Ct. 352 (1885); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184, 119 S. Ct. 1923 (1999) ("It is, however, an established part of our constitutional jurisprudence that we do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground."); *Wood v. Georgia*, 450 U.S. 261, 265-66, 101 S. Ct. 1097 (1981) (citing *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S. Ct. 152 (1944)); *United States v. Raines*, 362 U.S. 17, 21, 80 S. Ct. 519 (1960).

courts' doors to Fourth Amendment relief for previously frustrated Fifth Amendment takings claimants, the majority today contravenes both of these maxims of limited scope. Its erroneous analysis of the easement, *supra*, forces it to overlook the obvious conclusion that Severance lacks standing to bring a Fourth Amendment claim, just as she does to bring a Fifth Amendment claim. Additionally, the majority ignores that even if we were to assume *arguendo* that the Fourth Amendment could somehow provide relief under these circumstances, Severance's claim would fail on the merits and the district court's dismissal would have to be affirmed. Ultimately, however, the majority's Fourth Amendment analysis just goes too far, improperly countenancing the application of the Fourth Amendment in this textbook Fifth Amendment takings case. After all, the Fourth and Fifth amendments are *complementary*, not *duplicative*.

## A. Standing

As an initial matter that should end all this, Severance's putative Fourth Amendment seizure claim, like her takings claim under the Fifth Amendment, must be rejected for lack of standing. The Supreme Court in *United States v. Jacobsen* defined a "seizure" for purposes of the Fourth Amendment as a "meaningful interference with an individual's *possessory* interests in his property."[23] This definition alone is sufficient to defeat Severance's seizure claim, for there can have been no meaningful interference with a property right that has never belonged to Severance. Unlike her predecessor in title who owned the properties when the public's easement attached, Severance has never

---

[23] *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652 (1984) (emphasis added). The majority relies heavily on *Jacobsen*'s definition of seizure, yet refuses to see that the case cannot support the majority's Fourth Amendment-related holding.

held the "right to exclude" members of the public from any part of her property that constitutes dry beach. Thus the State's enforcement of the public's access to the beach does not interfere with or even diminish — does not "seize" — any possessory interest belonging to Severance. Never having had the right to exclude the public from the dry beach, Severance has suffered no *injury* and thus has no standing — a quintessential example of "no harm, no foul."

## B. Applicability of the Fourth Amendment

We must at all times remain mindful that it is the *Fifth* Amendment, not the Fourth, that protects an individual's right to *own* property while acknowledging the State's concomitant right to acquire private property, albeit under carefully curtailed conditions: (1) The intended use must be public, and (2) the owner must be justly compensated.[24] "The Takings Clause largely 'operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge.'"[25] In contrast, the *Fourth* Amendment protects, *inter alia*, an individual's right to *possess* property that he continues to

---

[24] The Takings Clause states: ". . . nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. *First English Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal.*, 482 U.S. 304, 314, 107 S. Ct. 2378 (1987).

[25] *Kelo v. City of New London, Conn.*, 545 U.S. 469, 487 n.19, 125 S. Ct. 2655 (2005) (quoting *E. Enters. v. Apfel*, 524 U.S. 498, 545, 118 S. Ct. 2131 (1998) (Kennedy, J., concurring in judgment and dissenting in part)). In analyzing the propriety of a taking, the courts are deferential to the "legislative judgments" at issue. *Id.* at 480.

*own*.[26] The State may not interfere with possession of private property unless its manner of doing so is *reasonable*.

Even though some aspects of the Fourth and Fifth amendments might overlap, they provide distinct protections and impose distinct requirements on the government. The seizure clause of the Fourth Amendment protects against unreasonable interference with possession, requiring neither compensation nor public use, while the Takings Clause of the Fifth Amendment protects against physical occupation, transfer of title, and the elimination of all economically beneficial use but does not contain the language of reasonableness. Rather, the Takings Clause implies that if just compensation is paid and the purpose of the taking is public use, then it follows that the taking is reasonable *per se*.[27] Conversely, the Fourth Amendment requires only reasonableness when the State interferes with possession. The State may justify a seizure as reasonable in a number of ways,[28] nearly all of which have been identified within the

---

[26] U.S. CONST. amend. IV; *see also Jacobsen*, 466 U.S. at 113. The Fourth Amendment reads, in relevant part: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ." The Fourth and the Fifth Amendment were made applicable to the states through the Fourteenth Amendment. *See, e.g.*, *Kelo*, 545 U.S. at 472 n.1 (Fifth Amendment); *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684 (1961) (Fourth Amendment).

[27] *First English Evangelical Lutheran Church*, 482 U.S. at 314-15; *see also Kelo*, 545 U.S. at 489-90; *Kelo*, 545 U.S. at 497 (O'Connor, J., dissenting). This is a trade-off the Framers' sanctioned. *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 325, 13 S. Ct. 622 (1893) ("it prevents the public from loading upon one individual more than his just share of the burdens of government").

[28] Obviously, the existence of a warrant based on probable cause will be sufficient. U.S. CONST. amend. IV.

criminal justice context — public safety,[29] contraband,[30] border security,[31] public health[32] — but none requires that the State put the property to a particular use *or pay the owner*! In essence, the Fourth Amendment provides no compensatory protection to the property owner like Severance, for once the State has satisfied the reasonableness requirement, its obligation is fulfilled. It is the Fifth Amendment, then, construed here through the lens of the Fourteenth Amendment, that ensures that the State must respect private property by curtailing the purpose for which the State may take (be it title, physical possession, or some crucial stick from the bundle of property rights), and requiring that when the State does take, it pay for the privilege. For the majority to say that the *Fourth* Amendment affords protection when the State takes a stick from the property-rights bundle is tantamount to permitting the

---

[29] *Terry v. Ohio*, 392 U.S. 1, 20-22, 24, 88 S. Ct. 1868 (1968); *see also Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 429 (5th Cir. 2008) (exigent circumstances such as imminent danger of physical or sexual abuse may justify seizing a child from his parents without a warrant); *United States v. Shannon*, 21 F.3d 77, 82 (1994) ("The exigent circumstances that must exist include: hot pursuit of a suspected felon; the possibility that evidence may be removed or destroyed; and danger to the lives of officers or others.").

[30] *Minnesota v. Dickerson*, 508 U.S. 366, 375-76, 113 S. Ct. 2130 (1993) ("if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context"); *Carroll v. United States*, 267 U.S. 132, 149, 45 S. Ct. 280 (1925) (search and seizure of vehicle valid if reasonable belief that it contains contraband).

[31] *United States v. Ramsey*, 431 U.S. 606, 616, 97 S. Ct. 1972 (1977) (inspections of persons entering the country are "reasonable simply by virtue of the fact that they occur at the border").

[32] *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300, 101 S. Ct. 2352 (1981) ("deprivation of property to protect the public health and safety is 'one of the oldest examples' of permissible summary action") (quoting *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599, 70 S. Ct. 870 (1950)); *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 828 (5th Cir. 1976) (seizure without notice can be invoked "only to avoid imminent danger to the public health and safety").

State to take without public purpose or without providing just compensation, or both.

Severance's argument thus leads her to a result that is diametrically opposed to the one she seeks: Less protection of property rights rather than more. In a case like this, in which Severance alleges nothing more than that the reason or purpose of the taking was erroneous, the Fourth Amendment does no "work" for her.[33] As I shall demonstrate in detail below, the State's action was unquestionably reasonable, leaving Severance uncompensated under the Fourth Amendment for the chimeric loss she now claims. In my judgment, this deftly illustrates why the Fourth Amendment simply does not apply to a takings claim masquerading as a seizure. It offers no quarter, and clearly explains why the Framers added the Fifth Amendment's Takings Clause, to *define* — that is, to *confine* — what is permissible when the State takes private property.[34]

Yet, in countenancing Severance's Fourth Amendment claim, the majority impermissibly opens the door to judicial cognizance of run-of-the-mill Fifth Amendment takings claims gussied up as seizure claims. Further, in a case like this that will now be heard sequentially to her Fifth Amendment claim (to say

---

[33] The majority protests that this court, as well as others have held, that claims may implicate multiple constitutional protections. *See John Corp. v. City of Houston*, 214 F.3d 573, 582 (5th Cir. 2000) (considering the interplay of the Fifth Amendment and substantive due process). I do not disagree. I contend only that the wrong Severance asserts has been inflicted on her has no remedy in the Fourth Amendment.

[34] *First English Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal.*, 482 U.S. 304, 314, 107 S. Ct. 2378 (1987). ("As its language indicates, and as the Court has frequently noted, [the Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power."). As a result, the Takings Clause subsumes the Fourth Amendment protections Severance seeks: We cannot know if a taking is reasonable until we know whether public use and just compensation are satisfied.

nothing of unnecessarily dragging the Texas Supreme Court into the fray), the majority opinion squanders judicial resources. The panel majority permits this takings claimant to don the trappings of a seizure claimant for a second bite at the constitutional apple.

I foresee additional problems, including that this permits Severance and future similar claimants to head off what might otherwise be deemed a valid taking by bringing a seizure claim before the takings claim ripens. Indeed, the State need not act pursuant to an easement to effect a taking. The taking would be valid so long as the intended use was public and the landowner justly compensated. The majority's holding turns the Fifth Amendment on its head, enabling what might be a valid taking to be an impermissible seizure (the takings claimant has not yet sought compensation so none has been paid), an impossible outcome.

## C. Reasonableness

In its rush to conclude that Severance's Fourth Amendment claim may proceed, the panel majority ignores the obvious, *viz.*, that her claim as pleaded is entirely without merit — a prudential basis of decision that would enable us to avoid the constitutional question altogether. Although Severance claims that she has suffered both a taking and a seizure, all she has really done is to clone her takings claim into a seizure claim. Her sole basis for alleging a violation of the Fourth Amendment's reasonableness requirement is that, despite all law and evidence to the contrary, the public previously had no right of access to the portion of her property affected by Rita. But this legal conclusion is not talismanic, merely relevant. Fourth Amendment claims are analyzed under a

standard of objective reasonableness[35] viewed through the lens of the totality of the circumstances, including the interests at stake.[36] Here, that calculus would entail balancing the interest of the public in continued access to beaches that the people have enjoyed for decades if not centuries, against a private landowner's interest in excluding members of the public — in the face of a 50-year-old, well-noticed statute, the risk of which Severance acknowledged, accepted, and presumably employed in negotiating her purchase price.[37]

Severance's seizure claim simply cannot survive this analysis on her sole asserted allegation that the easement had not attached. She does not argue that the State acted in bad faith because she cannot: The Texas courts have repeatedly upheld the statute and recognized its applicability to Severance's swath of Galveston's dry beach. At best, she could assert that the State's assumption that the easement applied was mistaken; yet, as the Supreme Court has recently reminded us, in the context of the Fourth Amendment, mistake alone is insufficient to demonstrate a constitutional violation.[38]

---

[35] *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865 (1989).

[36] *See*, *e.g.*, *Collins v. Ainsworth*, 382 F.3d 529, 538 (5th Cir. 2004) (quoting *Brown v. Texas*, 443 U.S. 47, 50-51, 99 S. Ct. 2637 (1979)).

[37] Indeed, the Court in *Soldal v. Cook County, Ill.*, made clear that a claim like Severance's is unlikely to succeed. 506 U.S. 56, 71, 113 S. Ct. 538 (1992). In seeking to allay fears that its holding would open the floodgate to frivolous civil seizure claims — just as we now face — the Court pointed out that "reasonableness is still the ultimate standard under the Fourth Amendment, . . . the reasonableness determination will reflect a careful balancing of governmental and private interests. Assuming, for example, that the officers were acting pursuant to a court order[,] . . . a showing of unreasonableness on these facts would be a laborious task indeed." *Id.* (internal citations omitted).

[38] *Herring v. United States*, ___ U.S. ___, 129 S. Ct. 695, 699 (2009) ("When a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation."); *see*

The majority makes much of the Fourth Circuit's decision in *Presley v. City of Charlottesville*, the lone circuit case countenancing simultaneous claims of taking and seizure.[39] But even assuming *arguendo* that *Presley* was correctly decided, it is factually distinguishable. Ms. Presley alleged that the City repeatedly encouraged public trespass onto her land by promulgating an erroneous printed trail-map (the trail did not actually cross Presley's land). When Presley complained, the City repeatedly refused to fix the error and ameliorate the illegal trespassing.[40] Instead, the City passed an ordinance authorizing it to prosecute Presley for defending her property.[41] Presley asserted actions of City misconduct, *viz.*, unreasonableness, that occurred in isolation from — and in addition to — the fact of the taking; Severance alleges no discrete facts that would render Texas's action unreasonable and distinct from the claimed taking.

## D. Consent

Finally, even if Severance were to manage the unlikely feat of demonstrating that the State's alleged "seizure" was unreasonable, she still could never overcome the fact that she forfeited any such right by consent when she purchased the properties with full and formal knowledge of the rolling easement and its very real potential for rolling. With rare exception, seizures

---

*also Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S. Ct. 2793 (1990) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment").

[39] *Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006).

[40] *Id.* at 482.

[41] *Id.* at 483.

following valid consent are constitutional.[42] By acknowledging and accepting the encumbrance on the properties at the time of her purchase, Severance consented to their effect *ad infinitum*, waived or forfeited any possible right to contest that encumbrance or to seek payment for it, and even accepted a form of compensation for this diminution in the value of the property by an intrinsic downward adjustment in the purchase price.[43] Her assent validated the encumbrance *cum* "seizure" the same way that consent to the inspection of one's vehicle typically validates a search and any ensuing seizure of the vehicle's contents that might otherwise have been deemed unreasonable.[44] As such, her consent constituted a waiver of the right to complain when the very easement to which she had expressly acceded in her purchase physically rolled further onto her already legally burdened property.

The majority ignores the arguments that counsel against its holding, instead expanding (erroneously) our interpretation of a constitutional provision that need not and should not even be directly addressed. I am convinced that today's holding needlessly obscures the line between the Fourth and the Fifth Amendments as carefully constructed by the Framers and spuriously opens the Fourth Amendment as an avenue for property-rights activists to attack the exercise of constitutionally permissible powers of eminent domain — a classic example of using a shield as a sword.

---

[42] *United States v. Hernandez-Zuñiga*, 215 F.3d 483, 487 (5th Cir. 2000) (citing *United States v. Woodrum*, 202 F.3d 1, 11 (1st Cir. 2000)); *see also Mason v. Pulliam*, 557 F.2d 426, 428 (5th Cir. 1977) (relying on *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973)).

[43] *United States v. Dow*, 357 U.S. 17, 27, 78 S. Ct. 1039 (1958) (discussing contractual and other remedies available to a private party who knowingly purchases encumbered land).

[44] *See, e.g.*, *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993).

## V. CERTIFICATION

It is not enough that the majority here countenances an argument that melds the Fourth and Fifth amendments; it then upends our policy on certification in furtherance of this course.   Although the decision whether to certify questions to a state supreme court lies within our sound discretion,[45] we must remain chary to exercise that discretion absent a "compelling reason."[46] The majority's explanation — that certification is required because the Texas Supreme Court has remained silent on this issue — is insufficient.[47]  The Texas intermediate courts are nearly unanimous.[48] And this question is not so complex or difficult a matter of state law that we must refrain from entering the fray — although even if it were, "we do not use certification as a panacea for resolution of complex or difficult state law questions which have not been answered by the highest court of the state."[49]  We should decide the issues before us by affirming the district court's dismissals on the prudential ground of lack of standing and failure to state a claim without venturing unnecessarily into the Constitutional bog.  I respectfully dissent.

---

[45] *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 487 (5th Cir. 2003).

[46] *Jefferson v. Lead Inds. Ass'n, Inc.*, 106 F.3d 1245, 1247 (5th Cir. 1997).

[47] *Id.* ("Alone, the absence of a definitive answer from the state supreme court on a particular question is not sufficient to warrant certification.")

[48] *Compass Bank v. King, Griffin & Adamson P.C.*, 388 F.3d 504, 505 n.1 (5th Cir. 2004).

[49] *Id.* at 505.